In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2881

United States of America,

Plaintiff-Appellee,

v.

Eunice Husband,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 CR 30050--Richard H. Mills, Judge.

Argued January 14, 2000--Decided August 22, 2000

Before Flaum, Chief Judge, and Easterbrook and Ripple,
Circuit Judges.

Flaum, Chief Judge. Defendant Eunice Husband
entered a conditional plea of guilty to one count
of possession of crack cocaine with intent to
distribute in violation of 21 U.S.C. sec.sec.
841(a)(1), (b)(1)(B). The defendant now appeals
the district court's denial of his motion to
suppress evidence that he claims was obtained in
violation of the Fourth Amendment's prohibition
against unreasonable searches and seizures. For
the reasons stated herein, we reverse and remand
for further proceedings consistent with this
opinion.

I. Facts

On March 12, 1998, the Springfield police
received a call from a neighborhood resident who
believed that drugs were being sold from a gray
four-door vehicle that was regularly parked in a
neighborhood driveway between 4:00 p.m. and 3:00
a.m. The caller stated that the car was occupied
by a male and a female who never entered the
residence at which the car was parked. In
addition, the caller told the police that
individuals would occasionally approach the
vehicle, speak with the male occupant, and leave
shortly thereafter.

The Springfield police responded to this call and began surveillance of the vehicle in question. After a period of time during which the car briefly left and then returned, the officers approached the vehicle to ascertain whether the occupants had permission to park in the driveway. As three officers approached the vehicle, two of the officers recognized the male occupant, the defendant in this case, as someone who had been involved in a prior incident involving a gun. The officers ordered both occupants to show their hands. The defendant refused to comply with the officers' orders. Instead, he lowered his hands to his waist area and then raised his hands back to his mouth. At this point, the officers noticed what appeared to be a large knot on the inside of the defendant's left cheek.

The officers removed the defendant from the vehicle and arrested him. Upon arrival at the Sangamon County Jail, the defendant was placed in an observation cell and was kept under constant surveillance. His hands remained handcuffed behind his back. On both the ride to the jail and during his time in the observation cell, the defendant refused to open his mouth and responded to the officers through clenched teeth.

Because the defendant would not open his mouth, the police began the process of obtaining a search warrant. While awaiting the warrant, the police noticed that the defendant was beginning to twitch and sweat as if experiencing a seizure. The defendant was then transported by ambulance to Saint John's Hospital. An officer accompanied the defendant to ensure that he did not dispose of anything in his mouth. On the way to the hospital, an emergency medical technician administered an I.V. to counteract the effect of any drugs the defendant might have swallowed./1

At approximately 11:00 p.m., an Illinois associate circuit judge issued a warrant to search "[t]he body of Eunice Husband" for "illegal drugs, weapons, or contraband." The issuance of the warrant occurred at about the same time the defendant was received in the emergency room. At the hospital, and before the police knew that a warrant had been issued, the police informed the attending doctor that they were attempting to obtain a warrant to search the defendant's mouth. The defendant was repeatedly asked to open his mouth voluntarily and was later informed that a warrant had been issued and that he should open his mouth. In addition, a brief attempt was made to pry open the defendant's mouth with a ceramic spoon. None of these attempts were successful. The doctor finally informed the defendant that a drug would be

administered through an I.V. that would enable the police to recover the items in his mouth if he refused to comply with the warrant voluntarily.

The defendant was administered 40 mg. of Amidate through an I.V. at approximately 11:22 p.m. According to the attending doctor, this general anesthetic was administered both for purposes of treating a possible drug overdose and in order to comply with the warrant. Within three minutes of the administration of the drug, the defendant fell unconscious. Three small plastic bags were subsequently recovered from the defendant's mouth. The bags contained a total of 20.3 grams of cocaine base. The defendant awoke at approximately 11:40 p.m. and was returned to the county jail. At approximately 1:00 a.m., the defendant was shown a copy of the search warrant permitting a search of his body.

The defendant was charged in a one-count indictment with possession of cocaine with intent to distribute. He filed a motion to suppress the drugs obtained from his mouth, arguing that they were the fruits of an illegal search. In support of this motion, the defendant argued that: (1) the officers lacked justification for a Terry stop; (2) giving a suspect an injection to carry out a search was unlawful; (3) failing to show the defendant the search warrant to give him an opportunity to voluntarily comply was unreasonable; and (4) the search warrant was overbroad in describing the items to be seized.

The magistrate judge's Report and Recommendation rejected all of the defendant's claims. The magistrate judge found sufficient justification for a Terry stop and also rejected the argument that the warrant was overbroad. In regard to the injection and subsequent search, the magistrate judge found that neither the injection nor the failure to show the defendant a copy of the warrant rendered the search unreasonable. The magistrate judge also found that the drugs would have been discovered even absent the allegedly illegal search and that the inevitable discovery doctrine would therefore allow the admission of the evidence.

The defendant renewed his claims as to the illegality of the search before the district court through objections to the magistrate judge's Report and Recommendation. After a de novo review of those claims, the district court adopted the findings of the magistrate judge and denied the motion to suppress. The defendant pled guilty, but reserved his right to appeal the denial of the suppression motion. The defendant now appeals, arguing that the district court

erred in refusing to exclude evidence of the drugs seized from his mouth.

II.  Analysis

The defendant contends that the district court erred in finding that the police acted reasonably in executing the warrant authorizing a search of the defendant's body. In considering such a challenge, we review the district court's findings of fact for clear error, see United States v. Duguay, 93 F.3d 346, 350 (7th Cir. 1996), and its determination as to the reasonableness of the search de novo, see Ornelas v. United States, 517 U.S. 690, 699 (1996); Duguay, 93 F.3d at 350. "'Because the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing.'" United States v. Gravens, 129 F.3d 974, 978 (7th Cir. 1997) (quoting United States v. Stribling, 94 F.3d 321, 323 (7th Cir. 1996)).

A.

The Fourth Amendment protects individuals against unreasonable searches. See Ohio v. Robinette, 519 U.S. 33, 39 (1996) (stating "that the 'touchstone of the Fourth Amendment is reasonableness'") (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)). In determining whether a search that intrudes below the surface of the body is reasonable, courts must weigh a variety of factors to determine whether society's interest in conducting the search outweighs the individual's interests in privacy and security. See Winston v. Lee, 470 U.S. 753, 760 (1985); Kraushaar v. Flanigan, 45 F.3d 1040, 1045 (7th Cir. 1995). "In a given case, the question whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting of few categorical answers." Winston, 470 U.S. at 760; see Cooper v. California, 386 U.S. 58, 59 (1967) ("[W]hether a search and seizure is reasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . ."). Only after a careful examination of the facts and circumstances of this case can we determine whether the police acted reasonably in anesthetizing the defendant to facilitate the removal of drugs from his mouth.

In considering the reasonableness of the actions of the Springfield police, we are guided by Supreme Court precedent that, although not answering the question before us, provides a framework for our analysis. Before the guaranties of the Fourth Amendment were held to apply to the

States, the Court addressed the proper limits on the police conduct of physically intrusive searches under the Due Process Clause of the Fourteenth Amendment. In Rochin v. California, 342 U.S. 165 (1952), the Court suppressed evidence obtained when the police broke into a suspect's house and, after witnessing the suspect swallow two capsules, initially attempted to forcibly extract the capsules from his mouth and then had his stomach pumped in order to recover them. In holding that this was conduct that "shock[ed] the conscience" and therefore violated due process guaranties,/2 the Court stated that "[i]llegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents--this course of proceeding by agents of government . . . are methods too close to the rack and the screw to permit constitutional differentiation." Id. at 172.

In Schmerber v. California, 384 U.S. 757 (1966), the Court considered the question whether the State had violated an individual's Fourth Amendment rights when it compelled an individual suspected of driving while intoxicated to submit to a blood test. The Court recognized that "[t]he intrusion perhaps implicated Schmerber's most personal and deep-rooted expectations of privacy, and . . . thus required a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." Winston, 470 U.S. at 760. After conducting such an inquiry, the Court held that, under the circumstances presented in Schmerber, the compelled blood test was reasonable. See Schmerber, 384 U.S. at 771. However, the Court was careful to state that simply because "the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited circumstances in no way indicates that it permits more substantial intrusions, or intrusions under other conditions." Id.

The Supreme Court returned to the question of physically invasive medical procedures under the Fourth Amendment in Winston v. Lee, when it considered the reasonableness of a compelled surgical procedure to recover a bullet from beneath the skin of a robbery suspect. Winston, 470 U.S. at 755. In that case, the Court analyzed the reasonableness of the proposed surgical procedure under what it called "the Schmerber balancing test," id. at 763, and considered the following factors: (1) "the extent to which the procedure may threaten the safety or health of the individual"; (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity"; and (3) "the community's interest in fairly and

accurately determining guilt or innocence." Id. at 761-62. After a consideration of these factors, the Court determined that, under the circumstances at issue in Winston, "the Commonwealth . . . failed to demonstrate that it would be 'reasonable' under the terms of the Fourth Amendment to search for evidence of this crime by means of the contemplated surgery." Id. at 766.

While the Supreme Court's decisions in Rochin, Schmerber, and Winston help delineate the contours of an individual's right to be free from unreasonable invasive medical procedures, they do not provide an easy answer in the instant case. The search at issue here was more intrusive on the defendant's personal autonomy than the one approved in Schmerber. The defendant in this case was sedated to the point of unconsciousness, a procedure that is less routine than the simple blood test at issue in Schmerber. Nevertheless, once the defendant was sedated, the police had only to reach into the defendant's open mouth to recover the drugs. This is less physically invasive than the compelled surgery that was held to violate the Fourth Amendment guaranty against unreasonable searches in Winston or the stomach pumping disapproved in Rochin. This case falls somewhere between the constitutional search in Schmerber and the unconstitutional searches in Rochin and Winston, and we must therefore consider carefully the facts and circumstances presented here under the Schmerber balancing test to determine the constitutionality of the challenged search.

B.

The first factor we consider is "the extent to which the procedure may threaten the safety or health of the individual." Winston, 470 U.S. at 761. Here, the search was conducted by a licensed physician in a hospital setting and there was nothing unusual about the procedure used to sedate the defendant. These are significant facts because they assure us that "all reasonable medical precautions were taken and no unusual or untested procedures were employed . . . ." Id. The use of general anesthesia is quite common, see id. at 764 n.7, and there is no evidence in the record that Amidate, the anesthetic used in this case, is a particularly dangerous drug. Furthermore, the defendant was anesthetized only because he refused to cooperate with the police. See State v. Lawson, 187 N.J. Super. 25, 29, 453 A.2d 556, 558 (App. Div. 1982) (finding a proposed surgical procedure "relatively minor" when, among other things, "general anesthesia [would] be needed only if defendant is uncooperative"); see also Winston, 470 U.S. at

765 n.9 (stating that "[s]omewhat different issues would be raised if the use of a general anesthetic became necessary because of the patient's refusal to cooperate"). However, we do not want to underestimate the seriousness of any medical procedure that renders a person unconscious. See Lee v. Winston, 717 F.2d 888, 900 (4th Cir. 1983), aff'd, Winston, 470 U.S. 753 (stating that even a safe and accepted anesthetic procedure carries with it an unknown level of risk). While it does not appear that the defendant was in any significant danger when placed under general anesthesia by a licensed physician in a hospital setting, the record is unclear as to the potential dangers faced by the defendant and as to the exact level of risk those dangers presented.

Although the threat to the defendant's health and safety does not appear to have been significant, "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," Winston, 470 U.S. at 761, was great. The Fourth Amendment protects against damage to "the individual's sense of personal privacy and security," regardless of whether the intrusion "injure[s] the physical person of the individual." Id. at 761-62 (citing Payton v. New York, 445 U.S. 573 (1980) (intruding into an individual's living room); Katz v. United States, 389 U.S. 347, 361 (1967) (eavesdropping on an individual's telephone conversations); Dunaway v. New York, 442 U.S. 200 (1979) (forcing an individual to accompany police officers to the police station)). In cases like the present one, where the search involves a physical intrusion, these privacy concerns are accompanied by the individual's fundamental interest in maintaining bodily integrity and control. See Schmerber, 384 U.S. 757 (administering a blood test); Cupp v. Murphy, 412 U.S. 291, 295 (1973) (taking a suspect's fingernail scrapings).

Because any medical procedure implicates an individual's liberty interests in personal privacy and bodily integrity, the Supreme Court has indicated that there is "a general liberty interest in refusing medical treatment." Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261, 278 (1990) (citing Vitek v. Jones, 445 U.S. 480, 494 (1980); Parham v. J.R., 442 U.S. 584, 600 (1979)); see also Cruzan, 497 U.S. at 309 (Brennan, J., dissenting) ("The right to be free from unwanted medical attention is the right to evaluate the potential benefit of treatment and its possible consequences according to one's own values and to make a personal decision whether to subject oneself to the intrusion."). In this case, the defendant was not allowed to refuse

medical treatment or to determine the course of his own care. Rather, the defendant was subjected to a compelled procedure during which a general anesthetic was injected into his system to treat his medical condition and to allow the police to execute the warrant they possessed to search his body./3 Under these circumstances, it is beyond question that the police's actions in sedating the defendant and removing the drugs from his mouth constitute a serious invasion of the defendant's personal privacy and liberty interests. See Winston, 470 U.S. at 765; Washington v. Harper, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.").

In order to determine the reasonableness of the police officers' actions in the present case, we must weigh these individual interests against "the community's interest in fairly and accurately determining guilt or innocence." Winston, 470 U.S. at 762. Like the defendant's interest in being free from unwanted medical care, the community's interest in accurate adjudication is an important one. See id. In addition, the community has a strong interest "in being free from the menace of crime . . . ." United States v. Serna-Bareto, 842 F.2d 965, 966 (7th Cir. 1988). Both of these interests were at stake in this case. If the police had not been able to recover the drugs from the defendant's mouth, it is highly unlikely that they would have been able to prosecute him for drug trafficking or possession. The defendant would then have been free to resume his criminal activities. Under these circumstances, the government's interest in recovering the evidence is strong.

Our conclusion as to the strength of the government interest is bolstered by our understanding of Schmerber, where the Court recognized the significance of the fact that blood tests are "a highly effective means of determining the degree to which a person is under the influence of alcohol," Schmerber, 384 U.S. at 771, and the importance of the fact that a blood test carries with it a high probability that evidence of guilt will be found, id. at 770. In this case, the police had a clear indication that the defendant carried drugs behind his clenched teeth,/4 and they were assured of certain recovery if they were able to reach inside his mouth. Moreover, the actual recovery of drugs from a suspect is the most effective means of determining guilt and provides essential evidence in a drug trial. Unlike Winston, where the recovery of the bullet was not a necessary aspect of the government's case, Winston, 470 U.S. at

765-66, the recovery of the drugs from the defendant's mouth almost certainly made the difference between the plea bargain the government obtained in this case and no case at all.

Even recognizing the government's need for the evidence, the central question remains whether the means by which the police went about obtaining that evidence was reasonable under the Fourth Amendment. We recognize that under certain circumstances it would be permissible to force a suspect to undergo a compelled medical procedure in order to enable the police to recover evidence of a crime. See United States v. Crowder, 543 F.2d 312, 316-17 (D.C. Cir. 1976) (en banc) (holding the surgical removal of a bullet "reasonable and proper" under the circumstances of the case), cert. denied, 429 U.S. 1062 (1977). However, we also recognize that the ability of police to subject suspects to unwanted medical procedures in the context of a search for evidence is limited by an individual's rights under the Fourth Amendment. See Winston, 470 U.S. at 767 (holding proposed surgery to recover bullet unreasonable); Rochin, 342 U.S. 165 (finding stomach pumping unconstitutional); United States v. Nelson, 36 F.3d 758 (8th Cir. 1994) (holding that compelled endoscopy was unreasonable); see also Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 849 (1992) ("It is settled now . . . that the Constitution places limits on a State's right to interfere with a person's most basic decisions about . . . bodily integrity."). The question before us is whether, in light of the individual and community interests we have just articulated, the police have overstepped Fourth Amendment limits on the facts of this case.

C.

The defendant contends that a suspect may never be rendered unconscious by use of general anesthesia in order to obtain evidence, but we do not believe such a per se rule is mandated by the reasonableness requirement of the Fourth Amendment. See United States v. Jones, No. 99-2359, 2000 WL 336887, at *6 (7th Cir. March 31, 2000) (refusing to adopt a bright-line rule for the amount of time officers must wait before a forcible entry). Rather, the proper inquiry is whether anything about the facts and circumstances of this case made the search unreasonable. Cooper, 386 U.S. at 59. In this regard, it is significant that the warrant obtained by the police only authorized a search of the defendant's body. There is no dispute in this case that the warrant included the authority to conduct a body cavity search, but the

defendant claims that the method of conducting the search--rendering the defendant unconscious-- was unreasonable in light of the circumstances. That is, the defendant argues that the police should not have rendered him unconscious for the purposes of executing the warrant for a search of his body absent prior judicial approval of the use of a general anesthesia.

The benefits of obtaining authorization to perform a compelled medical procedure are obvious: presentation to a neutral decisionmaker both ensures that the individual's Fourth Amendment rights are protected, see United States v. Chadwick, 433 U.S. 1, 9 (1977); Johnson v. United States, 333 U.S. 10, 13-14 (1948), and safeguards the health and safety of the suspect, Crowder, 543 F.2d at 316. A compelled medical procedure, coupled with an invasive search of a person's body cavity, is a significant intrusion upon an individual's dignitary and privacy interests and, whenever possible, should be preceded by a neutral evaluation of the manner in which the search is to be executed. See Winston, 470 U.S. at 763 n.6 (noting the importance of affording an individual appropriate procedural protections including, on the facts of that case, "the benefit of a full adversary presentation and appellate review"); Schmerber, 384 U.S. at 770 ("The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great."); Crowder, 543 F.2d at 316 (discussing the significance of a presentation of the evidence to "a neutral and detached magistrate"). However, despite our preference for more procedural safeguards in these circumstances, we also understand that while a warrant must be supported by probable cause and specify the place to be searched and the things to be seized, it generally need not include details as to the manner of execution. See Dalia v. United States, 441 U.S. 238, 257-58 (1979) ("Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants . . . must include a specification of the precise manner in which they are to be executed."). Rather, within the limits of reasonableness, the decision on how to execute a warrant is generally left to the discretion of the police. See id. ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant."). We thus return to the Schmerber test and ask whether "the officers executing the warrant employ[ed] a methodology that is, in light of the values protected by the Fourth Amendment and the exigencies of the situation, a

reasonable one." United States v. Jones, 54 F.3d 1285, 1292 (7th Cir. 1995).

D.

   When it is possible to obtain a warrant specifically authorizing a compelled medical procedure, the State's failure to obtain such a warrant can be an important factor in considering the State's interest in the procedure and in determining the reasonableness of the search. However, as just stated, the failure of the police to obtain judicial authorization of the medical procedure involved does not, in itself, render the search of the defendant unreasonable. In this case the police were faced with two circumstances that the district court appeared to regard as sufficient to justify the challenged search. First, the police were permitted to consider the possibility that valuable evidence could be lost if the defendant chose to swallow the drugs. See Schmerber, 384 U.S. at 770 (refusing to apply the exclusionary rule because of a concern about the potential destruction of evidence). Second, at the time the general anesthetic was administered to the defendant, there were concerns about the defendant's health and safety in the event he ingested the drugs. See United States v. Nelson, 36 F.3d 758, 761 (8th Cir. 1994) (upholding a warrantless search in circumstances "where the delay necessary to obtain a warrant . . . threatens the defendant's life."); United States v. Owens, 475 F.2d 759, 760 (5th Cir. 1973) (finding a search justified where "the officers acted in good faith to prevent further harm to [the defendant]"). While we agree that the potential loss of evidence and a good-faith concern about the defendant's health could justify this search under narrow circumstances, we do not believe that the record below is sufficiently developed for us to make a determination at the present time as to the exigencies existing at the time of the search.

   Our review of the record leaves us with significant questions as to the facts and circumstances surrounding the search in question. First, while there is no evidence in the record that the drug administered to the defendant was in any way dangerous, there is also no assurance that the drug was completely safe, nor any indication of the precise magnitude of the risk faced by the defendant. Second, the record below does not clearly indicate how imminent the police regarded the potential loss of evidence to be./5 Lastly, the record is ambiguous as to the extent of the medical emergency faced by the defendant at the time he was administered the anesthetic. Although there is evidence that the doctor involved was concerned about the defendant's

health, and there exists a doctor's statement that the anesthetic was administered both to facilitate the search and to treat the patient, there is no evidence that the medical emergency had reached the point where serious harm to the defendant was an immediate possibility.

Our concern over the paucity of the record in this case, particularly the lack of any testimony from either the police officers or the doctor involved, is heightened by the significant time lapse that occurred between the time the defendant put the drugs in his mouth and the time he was administered the general anesthetic. Specifically, it is not clear from the record why, if the police feared the potential loss of evidence or were concerned about the defendant's health, they did not act to remove the drugs from the defendant's mouth immediately upon realizing that he had secreted them there. We do not mean to imply that this time lapse indicates that the police acted unreasonably when they administered a general anesthetic to the defendant without a warrant specifically authorizing that procedure. However, before we can evaluate the reasonableness of the search, we need a more developed factual record as to why the police chose to act when they did and as to why the circumstances of the case did not permit the police to provide the defendant greater procedural protections, including application for a warrant from a neutral judicial officer specifically authorizing them to administer a general anesthetic to the defendant.

## III. Conclusion

Because the factual record in this case is insufficient for us to determine the reasonableness of the challenged search,/6 we REVERSE the decision of the district court and REMAND the case for further proceedings consistent with this opinion.

/1 Both parties agree that the decision to administer the I.V. was made by medical personnel in the ambulance, not by the police. That decision is therefore not at issue in this case.

/2 Although we cite Rochin as an example of unconstitutional police conduct, we recognize that the Court has shifted from a "shocks the conscience" standard under the Due Process Clause to one of objective reasonableness under the Fourth Amendment. See Lester v. City of Chicago, 830 F.2d 706, 711 (7th Cir. 1987). If Rochin were considered today, it "would be treated under the Fourth Amendment, albeit with the same result." Sacramento v. Lewis, 523 U.S. 833, 850 n.9 (1998).

/3 While this case clearly implicates the defendant's general right to be free from unwanted medical treatment, we find it significant that the defendant does not allege that the compelled medical procedure in question violated any sincerely-held religious belief. If such an allegation had been made, the individual's rights under the Free Exercise Clause would have to be considered as an important factor in the application of the Schmerber balancing test.

/4 Significantly, the defendant does not dispute that the police had probable cause for the search in question. See Schmerber, 384 U.S. at 769-70 (noting that when a case involves intrusions below the surface of the body it is necessary that police have a "clear indication" that evidence will be found).

/5 The issue as to the potential loss of evidence is further complicated in this case by the existence of an inevitable discovery issue. The inevitable discovery doctrine provides an exception to the exclusionary rule "when . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct . . . ." Nix v. Williams, 467 U.S. 431, 448 (1984). The confusion over the likelihood of the loss of evidence in this case appears to stem at least partially from the fact that the parties' arguments as to reasonableness and as to inevitable discovery are seemingly contradictory.

To the extent the drugs were likely to be recovered intact whether or not the defendant opened his mouth or swallowed the drugs, the exigent circumstances would be lessened and the reasonableness of the search undermined. However, in such a case, the evidence might well come in, as the district court determined, under the doctrine of inevitable discovery. In the reasonableness context the government thus has the incentive to argue that the drugs were likely to be lost if swallowed, while in the inevitable discovery context the government has the incentive to argue that the drugs would have been recovered regardless of whether the defendant swallowed the packets.

On the other hand, to the extent the drugs would not have been recovered had the defendant swallowed them, the government's inevitable discovery argument is weakened but its reasonableness argument is bolstered by the potential loss of valuable evidence. This gives the defendant the incentive to argue that the drugs would have been recovered if swallowed when

contesting the reasonableness of the search, but to argue to the contrary in the inevitable discovery context.

We do not address the district court's holding on the inevitable discovery doctrine for the same reason we do not decide the reasonableness issue: the record is insufficient for us to assess the risk that the police would have lost the evidence in question if the drugs were swallowed. If this issue comes before us again in the context of this case, we hope that not only will the record be more fully developed, but that the parties will give careful thought to reconciling their arguments on the reasonableness and inevitable discovery issues.

/6 The dissent contends that any question as to the reasonableness of the search in this case is rendered irrelevant by the "good faith" exception to the exclusionary rule recognized in United States v. Leon, 468 U.S. 897 (1984). Although we decline to conclusively address this question prior to a determination of the reasonableness of the search on remand, we doubt that the good faith exception to the exclusionary rule is applicable on the facts of this case. Leon dealt only with circumstances where the police properly and in good faith execute a warrant that, although valid on its face, later turns out to be deficient. See Leon, 468 U.S. at 926 (stating that the issue before the Court was "the propriety of [the exclusionary rule's] application in cases where the officers have relied on a subsequently invalidated search warrant"). We are not convinced that its reasoning should be extended to situations where the challenge is to the manner of execution of a valid warrant. See LaFave sec. 1.3(f) ("Fourth Amendment violations related to the execution of a warrant are unaffected by Leon . . . .") (citing United States v. Medlin, 798 F.2d 407 (10th Cir. 1986)).

Easterbrook, Circuit Judge, dissenting. If we had to decide in the abstract whether using anesthesia to recover drugs from a suspect's mouth is wise, all things considered, then this might be a difficult case and justify a remand. My colleagues offer a thoughtful discussion of the costs and benefits. But this is not an action seeking damages for an unreasonable search, nor is it an anticipatory objection to a proposed search, as in Winston v. Lee, 470 U.S. 753 (1985), where a court may assess reasonableness in advance. It is a criminal prosecution, and the search had the support of a warrant. Unless that

warrant was transparently defective, the evidence is admissible; constitutional errors in the terms of (or basis for) a search warrant do not support use of the exclusionary rule. United States v. Leon, 468 U.S. 897 (1984). This record reveals more than enough to show that the district judge did not err in denying Husband's motion to suppress.

The facts are simple, all the vital details undisputed. As police approached a reported drug-distribution point, Husband put in his mouth something large enough to produce a knot in his cheek. After Husband refused to open his mouth, the police sought a search warrant. While they waited for the judge's decision, Husband began to twitch and sweat. Police feared that he was experiencing a seizure from a drug overdose and took him in an ambulance to St. John's Hospital. At about 11 P.M. a state judge issued a warrant authorizing a search of "[t]he body of Eunice Husband" for drugs. Alan Gravett, an emergency-room physician at the hospital, told Husband about the warrant and asked him to open his mouth. Husband refused. Medical personnel then tried to pry Husband's mouth open, but when he resisted they stopped. Gravett again asked Husband to open his mouth and told him that the alternative was the administration of a muscle relaxant that would cause unconsciousness. Husband still kept his jaw clenched, so at 11:22 P.M. Gravett delivered 40 milligrams of Amidate in an intravenous solution. Husband was unconscious for about 15 minutes, under medical care the entire time. Nurses removed from his mouth three plastic bags, which held about 20 grams of crack cocaine. Gravett explained in a written statement to the district judge that this procedure was justified not only by the warrant but also by concerns about Husband's life: "possible life threatening overdose (as manifested by seizure activity) and potential airway obstruction made removal of material in mouth Medically Mandatory to prevent possible harm to patient." (Underlining and capitalization in handwritten original.)

Husband stipulated that Gravett, if called at the suppression hearing, would testify along the lines of his statement. Counsel representing Husband did not produce any medical evidence suggesting that Amidate was an inappropriate drug (or 40 milligrams an inappropriate amount) for this procedure, nor did Husband deny that the procedure appeared to the supervising physician to be "medically mandatory" under the circumstances. Instead of arguing that the manner of executing this warrant was unreasonable, Husband advanced two legal propositions: first, that a general anesthetic never may be used to

execute a warrant; second, that if anesthesia ever is permissible, it must be authorized explicitly by the warrant. The district judge rejected both of these propositions and denied the motion to suppress. Husband then entered a conditional guilty plea to the crime of possessing cocaine with intent to distribute, in violation of 21 U.S.C. sec.841(a)(1), reserving his right to appeal from the denial of his motion to suppress the drugs recovered from his mouth. Fed. R. Crim. P. 11(a)(2).

My colleagues do not accept either of Husband's arguments. A per se rule against anesthesia (or any other means of executing a search warrant) finds no support in the text of the fourth amendment or the Supreme Court's jurisprudence. Cases such as Winston show that some medical procedures are unreasonable in some circumstances (in Winston the search would have entailed surgery to extract a bullet, which the Court deemed unwarranted because the bullet was lodged deep inside the body and its recovery was unimportant to the criminal prosecution), but no decision condemns an entire class of procedures under all circumstances. Opening his mouth posed zero risk to Husband, and the risk created by his obduracy also was slight. No evidence in the record suggests that Amidate creates any dangers (even the danger of an allergic reaction). As for the second point: Dalia v. United States, 441 U.S. 238, 254-59 (1979), holds that a warrant need not specify the means of execution. See also Richards v. Wisconsin, 520 U.S. 385, 396 n.7 (1997). The fourth amendment tells us what must be in a warrant: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Nothing here requires specification of means to be used in execution. See generally Wayne R. LaFave, 2 Search and Seizure sec.4.8(g), sec.4.10 (3d ed. 1996). The warrant to search "[t]he body of Eunice Husband" met all constitutional requirements, and it would be folly to require judges, as opposed to physicians, to determine how to search inside a person's body.

My colleagues take a very different course, one of their own devising. They say that perhaps Dr. Gravett and the police should have waited Husband out. Eventually he would have opened his mouth, if only to eat, or would have swallowed the plastic bags, which could have been recovered from his stools some days later. They direct the district court to conduct additional proceedings to investigate these possibilities, which could have avoided the administration of any drugs and therefore better served Husband's interest in

bodily integrity.

   Patience may be a virtue, but the question my
colleagues pose for the district court is not one
in which Husband had any interest. He could have
offered medical evidence at the suppression
hearing but chose not to do so. We should respect
the parties' decisions rather than prolong
litigation because the record does not answer
questions that we would have posed had we been in
counsel's shoes. And I do not suspect Husband's
lawyers of incompetence. Neither the police nor
Dr. Gravett could tell what was in Husband's
mouth or how well it was wrapped; for all they
knew he had a lethal quantity of drugs in leaky
packaging. Gravett thought that immediate
intervention was "Medically Mandatory to prevent
possible harm to patient." Nothing in my
colleagues' opinion calls this assessment into
question or implies that the procedures used to
administer the drug (and to attend Husband until
his recovery) were medically deficient, or that
the use of brute force would have been superior
to the use of muscle relaxant. If Gravett had not
acted, we might now be considering a suit by
Husband's heirs under 42 U.S.C. sec.1983,
contending that the state violated his rights by
not forcing his mouth open and saving his life.

   Leon makes a remand pointless. By parallel to
the Constitution's knock-and-announce requirement
for search of a dwelling, see Wilson v. Arkansas,
514 U.S. 927 (1995), the police were obliged to
inform Husband of the warrant and ask him to open
his mouth, so that forcible entry could be
avoided. They did this. Once Husband refused, the
police were entitled to use force--a battering
ram to open a door, a drug to open a mouth. Even
if it would be better practice for warrants to
specify details of execution, this one did not;
the error, if any, was made by the issuing judge
rather than by the police. Likewise the state
judge erred if, as my colleagues imply, he should
have held a hearing before issuing the warrant.
Slip op. 13 (stating "our preference for more
procedural safeguards in these circumstances").
What safeguards, in particular? My colleagues
mention "a full adversary presentation and
appellate review" (ibid.). An adversarial hearing
at 11 P.M., followed by appellate review, while a
suspect who lacks counsel is having seizures from
an apparent drug overdose and may die if medical
personnel tarry? Under these circumstances a
warrant probably was unnecessary, see Schmerber
v. California, 384 U.S. 757, 770-71 (1966); it is
hardly the occasion to make warrants harder to
obtain. Search warrants are issued ex parte even
though they may authorize police to invade
private places, papers, and conversations. Surely
Leon does not permit a court to suppress evidence

just because appellate judges prefer to replace ex parte search warrants with leisurely proceedings. The police did the right thing by taking the matter up with a court in advance. Leon holds that errors by a judicial officer do not justify suppression.

One assumption underlying the discussion so far requires defense. I have assumed that a warrant to search "[t]he body of Eunice Husband" authorizes a search inside his mouth, rather than just of his clothing and skin. Doubtless the state judge could have chosen better language, but the point of the warrant was clear. The judge knew exactly what the police wanted to do: get the contents of Husband's mouth. The affidavit, which was sworn before the judge and apparently attached to the warrant, describes the situation in detail, adding to what I have already mentioned that three officers "felt Husbands [sic] cheek and it felt like a hard rock like object between his teeth and cheek." Police would not have asked for a warrant to search Husband's person and effects; they could do that without judicial approval, indeed without suspicion. See United States v. Robinson, 414 U.S. 218 (1973); United States v. Edwards, 415 U.S. 800 (1974). The only reason to issue a warrant was to authorize intrusion into the body, so the warrant must be understood in that light. Whether or not the judge should have given that authorization, Leon shows that the results of executing the warrant were admissible in evidence--unless perhaps the warrant was executed by unreasonable means. But as I have already noted Husband does not challenge the means of execution, except to say that evidence never may be secured using medical procedures that entail unconsciousness, and that position is untenable.

Husband brought the muscle relaxant on himself by refusing to open his mouth. Note the gulf between this situation and that of Winston, Schmerber, and Rochin v. California, 342 U.S. 165 (1952), where invasive procedures were unavoidable, and courts had to decide whether obtaining the evidence at all could be justified. Here, by contrast, the warrant could have been executed without force and without risk had Husband cooperated--as he was legally obligated to do. My colleagues' statement, slip op. 10, that Husband "was not allowed to refuse medical treatment, or to determine the course of his own care", is false on multiple levels: the administration of Amidate was not designed as "treatment" or "care" for some illness, and Husband was given the opportunity to rule his own fate--by opening his mouth. Police rightly may be required to ask suspects to open both mouths and doors before using force; and it would be unreasonable to use a medical means of conducting

a search without medical supervision, but here the request was made and medical details were left to Dr. Gravett and his staff. This is a paradigm of conscientious police work.

The majority does not describe any means of executing this warrant more appropriate than the one Dr. Gravett selected. What holds their interest is the possibility that the police might have secured the evidence without relying on the warrant. In other words, the remand is designed to explore the question whether it was reasonable to execute the warrant. As far as I know, this is a novelty. Treating execution of a valid warrant as itself unreasonable would eviscerate Leon and authorize suppression of evidence if the court concludes in retrospect that the evidence could have been obtained in some less intrusive way. It is like saying that if the police arrive at a drug dealer's house, knock and announce their purpose, and are told that they will not be admitted, they should sit down and cogitate whether they could obtain the evidence by waiting for the inhabitants to emerge in a day or two to buy food. Yet if peaceable entry is refused, then police armed with a warrant may break down the door and conduct the search, without being exposed to a later inquiry whether the suspect might have been nabbed on the street rather than at home. That's exactly the position the police occupied with regard to Husband, though the place to be searched was a mouth rather than a living room or bedroom or telephone conversation or file cabinet, and they behaved in exactly the proper way.

A warrant authorizes (and when read literally commands) the police to perform a search. True enough, probable cause does not justify risky intrusions for minuscule gain; Winston holds as much. But if the judge asked to issue the warrant authorizes the police to use force to overcome resistance (and this is what every warrant authorizes), and the police are met with resistance, then force may be used. Evidence thus seized may be suppressed only when every reasonable officer would have known of the warrant's invalidity. Cf. Ornelas v. United States, 517 U.S. 690, 698-99 (1996); Illinois v. Gates, 462 U.S. 213, 236 (1983); Spinelli v. United States, 393 U.S. 410, 419 (1969) (all requiring "great deference" to the decision of a judicial officer who issues a warrant). My colleagues do not believe that every reasonable officer should have known that the warrant to search "[t]he body of Eunice Husband" (that is to say, the inside of his mouth) was constitutionally infirm. Indeed, the very fact that the majority has difficulty assessing reasonableness even after a suppression hearing--

and that a federal magistrate judge, a federal district judge, and the third member of this panel believe that there was no infirmity--show that an officer on the scene would not have known that the warrant was invalid. Leon holds that a court may not exclude evidence just because, taking a refined view years after the search, appellate judges believe that the warrant was infirm. Suppressing evidence because a judge disagrees with a physician's solution to a medical problem could not help to deter constitutional misconduct by the police, the exclusionary rule's only proper function. See, e.g., Pennsylvania Board of Probation v. Scott, 524 U.S. 357, 362-65 (1998); Nix v. Williams, 467 U.S. 431, 442-43 (1984).

Let us put Leon aside, however, and explore the roads not taken. What else might have happened? One possibility is that the cocaine would have dissolved in Husband's body, destroying the evidence. A second possibility is that Husband eventually would have relented and opened his mouth. A third is that the plastic bags containing the crack would have passed through Husband's digestive system without rupturing or leaking, so that the drugs could have been recovered by searching Husband's excrement. A fourth is that some medical procedure not involving unconsciousness (perhaps a sedative or a local anesthetic that would have deprived Husband of control over his jaw muscles) could have been employed. Possibilities two, three, and four all lead to recovery of the cocaine. The inevitable-discovery doctrine tells us not to use the exclusionary rule when full compliance with the Constitution was bound to yield the same evidence. Murray v. United States, 487 U.S. 533, 536-41 (1988); United States v. Jones, 214 F.3d 836 (7th Cir. 2000).

That leaves possibility one: that delay would have enabled Husband to succeed in his quest to keep the drugs from the police. My colleagues observe that it is an open question whether the drugs would have been lost (indeed, whether Husband would have died as a result) had the police waited. Slip op. 15 n.5. True enough--but the answer is not legally relevant. That suspects could have destroyed their drugs, if only they had more time, does not justify suppression. The exclusionary rule is not designed to reward the destruction of evidence. See Segura v. United States, 468 U.S. 796, 813-16 (1984). When deciding whether discovery was "inevitable," Segura holds, courts must assume that suspects behave lawfully. Spoliation of evidence (the first possibility) is not lawful, and all lawful alternatives lead to recovery of the drugs, so Husband's motion to suppress was properly denied

even if the warrant was executed in an unreasonable manner or should not have been executed at all. Arguments can be made pro and con about the wisdom of Dr. Gravett's decision, but application of the exclusionary rule is out of the question.