# In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 01-4082

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EUNICE HUSBAND,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 98-CR-30050—**Richard Mills**, *Judge.*

---

ARGUED SEPTEMBER 17, 2002—DECIDED NOVEMBER 4, 2002

---

Before FLAUM, *Chief Judge,* and EASTERBROOK and RIPPLE, *Circuit Judges.*

FLAUM, *Chief Judge.* This case is before us for a second time. Defendant Eunice Husband entered a conditional plea of guilty to one count of possession of crack cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), after the district court denied his motion to suppress evidence that cocaine was found in his mouth. Husband retained his right to appeal the denial of the motion to suppress. Husband appealed, and this court reversed the denial and remanded the case so that a more complete factual record could be developed. *United States v. Husband,* 226 F.3d 626 (7th Cir. 2000). Upon further factfinding the district court again denied the mo-

tion to suppress. Husband appeals. The factual record now establishes that the method of executing the warrant was constitutionally reasonable, and we affirm.

## I. Background

*a. Facts*

A few days prior to March 12, 1998, Springfield police received a call from a neighborhood resident who suspected that a vehicle parked in the driveway at 1225 North Fifth Street was involved in the sale of drugs. The caller informed the police that every day a black male parked a gray four-door vehicle in the driveway with the front end of the car toward the street from 4:00 P.M. until 3:00 A.M.

Police Detectives Bonnett and Welsh conducted surveillance on the vehicle from the caller's house. During the surveillance the car drove away and the detectives attempted to follow it but lost sight of the car. After returning to the caller's home the detectives saw the gray car pull into the driveway at 1225 North Fifth Street again. The car was occupied by a black male, who turned out to be Eunice Husband, in the driver's seat and a white female in the passenger's seat. The detectives contacted Officer Termine who, along with three other officers, approached the vehicle. One of the officers recognized Husband from a past incident involving a firearm. The officers ordered the occupants to show their hands. The female occupant did so immediately. Husband did not. One of the officers drew his revolver and again ordered Husband to show his hands. Husband then lowered his hands and placed them inside his underwear. After continually ignoring police commands to show his hands, Husband lowered his head and raised his cupped hands to his lips and appeared to place something in his mouth. When

Husband removed his hands from his face a very large lump in his left cheek was visible.

The officers removed Husband from the vehicle, placed him on the ground, and cuffed him. The officers instructed Husband to spit out whatever was in his mouth. Husband refused. The officers arrested Husband for obstruction and resisting a police officer. On the trip to the jail Husband continued in his refusal to open his mouth. An officer observed him during the trip to make sure nothing went in or out of his mouth.

Because he possibly possessed illegal drugs, Husband was not admitted to the county jail. Instead he was placed in a padded isolation cell. At this point Detective Walsh began the process of obtaining a warrant to search Husband's body. In the meantime the officers observed Husband start to sweat and twitch and saw his eyes begin to flutter and roll back. A correctional officer noticed that the bulge in Husband's cheek had dissipated. The officers, thinking Husband might be having a seizure, called for an ambulance.

Husband was transported to St. John's Hospital. At about the same time a warrant was issued to search Husband's body. The officers and medical staff with Husband learned of this about 10 minutes later. During transport Emergency Medical Technicians Curt Moffit and Mike Dozier started an IV in defendant's arm and administered Narcan through that IV.[1] The radio log shows that the EMTs reported that Husband displayed seizure-like activity.

When the ambulance arrived at the hospital, Dr. Alan Wayne Gravett attended to Husband. Gravett informed

---

[1] Narcan is a narcotic antagonist generally given in cases of overdose to reverse the effects of certain opiates.

Husband of the dangers presented by the foreign object in his mouth. Dr. Gravett and others attempted to pry Husband's mouth open with a ceramic spoon. This method failed and was abandoned for fear of damaging Husband's teeth and gums. Dr. Gravett informed Husband that drugs would be administered to render Husband unconscious if he did not open his mouth. Dr. Gravett also informed Husband that a search warrant had been obtained.

Husband did not open his mouth. Dr. Gravett then consulted with a colleague, Dr. Michael Jones, to determine the best course of action. Additionally he reviewed two medical texts: *Rosen's Principles and Practice of Emergency Medicine* and *Tientalli Emergency Medicine*. Dr. Gravett then administered forty milligrams of Etomidate[2] to Husband through the IV the EMTs had started. Husband's mouth relaxed and Dr. Gravett removed the objects, 20.3 grams of crack cocaine in plastic baggies. As a result of the Etomidate Husband stopped breathing and Dr. Gravett used a bag and mask to administer forced breathing until Husband began breathing on his own.

Subsequently the hospital monitored Husband to ensure his safety. Detective Welsh then provided Husband with a copy of the warrant. Husband was then brought back to the county jail.

### b. Procedural History

After indictment Husband moved to suppress the evidence regarding the 20.3 grams of crack. The motion was based on various claims of Fourth Amendment violations that Husband claimed were inherent in the initial stop and the search. A hearing was held before a magis-

---

[2]  Etomidate is also known as as Amidate.

trate judge. The hearing was conducted on stipulations and medical records without any witnesses. The magistrate judge entered a Report and Recommendation, which the district court adopted, and the motion ultimately was denied. Husband entered into a conditional plea agreement reserving the right to appeal the denial of the motion to suppress. On appeal Husband argued only that the use of anesthetic to execute a search warrant violated the Fourth Amendment. This court was unable to determine whether the search was reasonable on the record before us at that time. After stating the legal standard for determining whether a search was constitutionally reasonable, we noted certain facts that were not discernible from the record before us. We reversed the denial and remanded for the development of a more complete factual record.

On remand the magistrate judge conducted an evidentiary hearing. At the hearing Husband raised, in addition to his challenge to the method of the search itself, challenges to the stop, arrest, and validity of the warrant. The magistrate judge found that our remand was general but that Husband had waived these additional challenges. At the hearing numerous witnesses including Dr. Gravett and two expert doctors, one for each side, testified. The magistrate judge entered a Report and Recommendation which the district court adopted in denying the motion to suppress. Husband then appealed to this court.

## II. Discussion

*a. Scope of Remand and Waiver*

Our initial task is to make clear what issues were open for argument after our first remand. Because some confusion exists about the interplay between the term "scope of remand" and the question of whether issues were waived at the initial appeal, we find it necessary to clarify

the law on this point. This confusion is linguistic and can be cleared up by simply recognizing that this court does not remand issues to the district court when those issues have been waived or decided. The question of whether an issue was waived on the first appeal is an integral and included element in determining the "scope of remand." In fact, any factors that limit remand are implicitly taken into account when this court remands a case. *See United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996). Thus "scope of remand" is an inclusive term and is the relevant inquiry.

There are two major limitations on the scope of a remand.[3] First, any issue that could have been but was not raised on appeal is waived and thus not remanded. *See United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) ("[P]arties cannot use the accident of remand as an opportunity to reopen waived issues."); *Parker*, 101 F.3d at 528 ("A party cannot use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal."); *see also Barrow v. Falck*, 11 F.3d 729, 730 (7th Cir. 1993) ("An argument bypassed by the litigants, and therefore not presented in the court of appeals, may not be resurrected on remand and used as a reason to disregard the court of appeals' decision."). Second, any issue conclusively decided by this court on the first appeal is not remanded. *Morris*, 259 F.3d at 898. To determine whether an issue falls within the second limitation the opinion needs to be looked at as whole. The court may explicitly remand certain issues exclusive of all others; but the same re-

---

[3] The general principle that the district court can only hear a case within the scope of the remand is derived from the "law of the case" doctrine. *See United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) ("[T]he 'law of the case' generally requires [the district court] to confine its discussion to the issues remanded.").

sult may also be accomplished implicitly. *Parker*, 101 F.3d at 528 ("[T]he scope of the remand is determined not by formula, but by inference from the opinion as a whole."). For example "[i]f the opinion identifies a discrete, particular error that can be corrected on remand without the need for a redetermination of other issues, the district court is limited to correcting that error." *Parker*, 101 F.3d at 528; *see also Barrow*, 11 F.3d at 730. In such a case the implication is that for arguments not addressed in the remanding opinion the two possibilities are that "we thought so little of the point that we did not see a need to discuss it, or [the party] did not invoke . . . and thereby waived the point." *Barrow*, 11 F.3d at 730-31. The court's silence on the argument implies that it is not available for consideration on remand. *See Barrow*, 11 F.3d at 731 ("Whether the argument was rejected sub silentio or was surrendered, it was unavailable on remand.").[4]

With this rule clarified we turn to reviewing the district court's determination of what issues were open for argument after our remand. The scope of the remand is a question that we review *de novo*. *See United States v. Watson*, 189 F.3d 496, 500 (7th Cir. 1999).

In *Husband I* the parties did not raise, nor did we address, the issues of the *Terry* stop, the arrest, or the validity of the warrant. The defendant had waived these issues and thus they were not in the scope of our remand. Furthermore, implicit in our decision was the limitation that on remand the district court was to address only the issue of the search. The search was the only issue addressed. We noted: "There is no dispute in this case that the warrant included the authority to conduct a body cavity search, but the defendant claims that the method of conducting the search—rendering the de-

---

[4] Issues that arise anew on remand are generally within the scope of the remand. *See Morris*, 259 F.3d at 898.

fendant unconscious—was unreasonable in light of the circumstances." *Husband I,* 226 F.3d at 634. We also pointed out that "the defendant does not dispute that the police had probable cause for the search in question." *Id.* at 633 n.4. Three questions about the search were left undecided and thus available for consideration on remand: (1) Was the search constitutionally reasonable? *Id.* at 636 ("[T]he factual record in this case is insufficient for us to determine the reasonableness of the challenged search."). (2) If the search was not reasonable does the inevitable discovery doctrine apply? *Id.* at 635 n.5 ("We do not address the district court's holding on the inevitable discovery doctrine [because] the record is insufficient."). (3) If the search was not reasonable does the "good faith" exception apply? *Id.* at 636 n.6 ("[W]e decline to conclusively address this question prior to a determination of the reasonableness of the search on remand.").

With respect to the first question we further limited the remand by identifying three specific issues which needed to be addressed. We listed three major questions:

> First, while there is no evidence in the record that the drug administered to the defendant was in any way dangerous, there is also no assurance that the drug was completely safe, nor any indication of the precise magnitude of the risk faced by the defendant. Second, the record below does not clearly indicate how imminent the police regarded the potential loss of evidence to be. Lastly, the record is ambiguous as to the extent of the medical emergency faced by the defendant at the time he was administered the anesthetic.

*Id.* at 635. We stated that the need for a factual record on these questions was necessary to determine the reasonableness of how the police chose to act and when they chose to act. *Id.* at 636.

Thus, the remand was limited and the new claims that Husband raised at the district court level were not within

the scope of the remand. Additionally, the government argued below and the district court agreed that the doctor was not a state actor. This argument was also outside the scope of the remand. Three times in *Husband I* this court noted that the doctor was at least partially motivated by the desire to execute the warrant. *Id.* at 629 ("According to the attending doctor, this general anesthetic was administered both for the purposes of treating a possible drug overdose and in order to comply with the warrant."), at 632 ("Rather, the defendant was subjected to a compelled procedure during which a general anesthetic was injected into his system to treat his medical condition and to allow the police to execute the warrant they possessed to search his body."), and at 635 ("[T]here exists a doctor's statement that the anesthetic was administered both to facilitate the search and to treat the patient."). Throughout the opinion we discuss the reasonableness of the *police officer's* actions. Not once do we discuss the possibility that the doctor was acting independently as a non-state actor. As such the argument was not within our remand as it had either been waived or decided in *Husband I*.[5]

### b. Execution of Search

In Fourth Amendment challenges we review the district court's findings of fact for clear error and its deter-

---

[5] We also have doubts as to whether the record would support a finding that Dr. Gravett acted completely independent of the state. His signed statement in the record noted that the procedure was performed in part to comply with the search warrant. When questioned about this statement on remand he did not deny that compliance with the warrant was a motivating factor. He simply stated his inability to recall the warrant and stressed the medical motivation involved.

mination as to the reasonableness of the search *de novo.*
*See Husband I*, 226 F.3d at 629.

In *Husband I* we noted: "In determining whether a
search that intrudes below the surface of the body is rea-
sonable, courts must weigh a variety of factors to deter-
mine whether society's interest in conducting the search
outweighs the individual's interest in privacy and security."
*Id.* at 630 (citing *Winston v. Lee*, 470 U.S. 753, 760 (1985)).
We found the intrusion inherent in this case to lie some-
where between the search held to be constitutional in
*Schmerber v. California*, 384 U.S. 757 (1966) (state com-
pelled an individual suspected of driving while intox-
icated to submit to a blood test) and the search held
to be unconstitutional in *Rochin v. California*, 342 U.S.
165 (1952) (a due process case where the police, after
breaking into the suspect's home, had suspect's stomach
pumped in order to recover drugs they witnessed him
swallowing). We applied "the *Schmerber* balancing test" in
an attempt to determine whether the search in question
fell on the constitutional side of the line. The *Schmerber*
balancing test requires the court to consider the follow-
ing facts: (1) "the extent to which the procedure may
threaten the safety or health of the individual"; (2) "the
extent of intrusion upon the individual's dignitary inter-
ests in personal privacy and bodily integrity"; and (3)
"the community's interest in fairly and accurately deter-
mining guilt or innocence." *Winston*, 470 U.S. at 761-62.
In *Hubsand I* we found the factual record to be insuffi-
cient for us to apply the balancing test to the search in
question. We remanded for a development of a factual
record on the risk involved with the administration of
Etomidate, the potential for loss of evidence, and the
medical emergency facing Husband from the object in his
mouth. There is now a sufficient record on two of those
issues to decide this case.

### i. Potential Loss of Evidence

In *Husband I* we commented that the record below "[did] not clearly indicate how imminent the police regarded the potential loss of evidence to be." *Husband I,* 226 F.3d at 635. We noted further that this issue was complicated by the inevitable discovery issue. *Id.* at 635 n.5. Because the government was arguing both that the search was reasonable and that the evidence was inevitably discoverable, the parties had an incentive to argue both sides on the factual question of whether there was a significant potential for the evidence to be lost. *Id.* As a result we viewed the parties' arguments as "seemingly contradictory" and noted a desire that "[i]f this issue [i.e., potential loss of evidence] comes before us again in the context of this case, we hope that not only will the record be more fully developed, but that the parties will give careful thought to reconciling their arguments on the reasonableness and inevitable discovery issues." *Id.* The magistrate judge wrote this request off in a footnote stating: "The court is not as concerned as the Seventh Circuit was with the parties' seemingly contradictory arguments . . . because the court understands the parties merely to be arguing in the alternative." The government's arguments are, however, not what are normally viewed as acceptable alternative positions. While the district court may make alternative legal findings, it cannot make inconsistent findings on pure questions of fact. This court is unable to give appropriate deference to such factual findings.

With this case before us again we regretfully note that there is still no record on how imminent the police regarded the potential loss of evidence. The government's brief on the issue of loss of evidence in the reasonable search context does nothing more than quote from this court's opinion in *Husband I* while presenting no new factual or legal arguments. The district court's opinion

does not speak to the risk of losing evidence in its discussion of the reasonableness of the search, and the discussion of the issue in the context of inevitable discovery does not address any facts this court was not already aware of in *Husband I*. Therefore we are left with no record on how imminent the police regarded the potential loss of evidence upon which to base this decision.[6]

### ii. Risks Involved in the Administration of Etomidate

The record before us now is clear on the risks involved in the administration of Etomidate. The magistrate judge heard the testimony of Dr. Gravett as well as two expert witnesses. The district court, in findings supported by the record, found that the risk involved in administering the Etomidate was relatively low. Dr. Gravett and Dr. Griffin both testified that Etomidate was a commonly administered drug for the purpose of sedating patients.[7] Dr. Gravett testified: "In this instance, with his clenched mouth, [Etomidate] appeared to be the only or the safest agent we had available that would promptly cause relaxation allowing the offending substance to be removed, and the other reason we chose it, the other reason was because of the safety profile and extremely brief duration of action." While the drug does carry the risk that the patient will stop breathing, and in fact Husband did stop breathing, the dangers associated with this risk were low given the ability to use forced breathing methods. Etomidate was, according the Drs. Gravett and Grif-

---

[6] Our inability to resolve this issue does not preclude us from deciding this case. The record on the remaining two issues, discussed below, provides sufficient basis for us to affirm the district court's denial of the motion to suppress.

[7] Dr. Gravett testified that Etomidate is the "drug of choice for sedation in the emergency department."

fin, the safest method of removing the object from Husband's mouth relative to all other alternatives. Additionally, the district court found that Dr. Gravett consulted another physician as well as two medical texts. After doing so Dr. Gravett was convinced that the use of Etomidate was the safest and most appropriate means of removing the object from Husband's mouth. The district court found the testimony of Dr. McDonald, the defendant's expert witness, to lack credibility. This finding was based on Dr. McDonald's misperception of the facts involving the chronology of when the patient was "bagged" to force breathing, and on his testimony about the dangers posed to the human body by the ingestion of twenty grams of cocaine,[8] which the district court found to defy common sense. These factual determinations by the district court all find support in the record and there is nothing to suggest that they are clearly erroneous.

### iii.  Medical Emergency facing Husband

The district court found: "Because Defendant had been experiencing periods of unresponsiveness, because he had a large foreign object in his mouth which could move to and block his airway, and because the foreign object was suspected to be crack cocaine which, if ingested, could cause toxicity or morbidity, Dr. Gravett deemed defendant's condition to be a medical emergency." The testimony of the doctors established a factual basis for the trial court to make this determination and to determine that the emergency was extremely serious. When Husband arrived at the hospital the police officers had observed him sweating and twitching and the EMTs had reported seizure-like activity. The officers also believed that Husband potentially had a large quantity of drugs

---

[8]  This testimony is discussed below.

in his mouth. Given this medical history coupled with the fact that Husband was displaying other possible signs of having suffered a seizure, Dr. Gravett reasonably assumed that Husband was facing an immediate medical emergency.[9] Dr. Griffin testified that all these factors could have indicated that Husband was postictal, the condition following a seizure. In such a condition Husband's non-responsiveness could have resulted from an inability to respond rather than an unwillingness, and he was at risk of accidentally swallowing the object in his mouth.

Husband's condition made it more likely that the object in his mouth was in fact a drug. Drs. Gravett and Griffin testified that the danger posed to a patient from digesting a large amount of drugs was extreme. They testified specifically that ingestion of such a large quantity of cocaine would cause toxicity and likely death.

The emergency was of such a level that the procedure Dr. Gravett performed was medically necessary regardless of the warrant. Dr. Gravett testified, and Dr. Griffin agreed, that Dr. Gravett would have done the exact same thing had Husband come in without the police officers and without concern for whether evidence could be recovered.[10]

---

[9] Dr. Gravett testified: "You've got somebody with a large amount of cocaine in their body, and there is any potential that can rupture, that person can die fast, and the other concern was with his possible seizure and periods of unresponsiveness, the concern was that this large, foreign body that appeared to be in his mouth could go to his airway and cause an obstruction; therefore, that made it a medical emergency."

[10] There are some unresolved issues about consent. Dr. Gravett claims that because Husband faced a life-threatening danger and refused treatment he gave informed consent. Dr. Griffin also testified that Husband may have been postictal, suggesting

(continued...)

Dr. McDonald testified that the danger posed to Husband was not as high as the government witnesses had claimed. Specifically he testified that if an individual places a large quantity of cocaine in his body and shows no symptoms of toxicity then the individual is unlikely to become symptomatic. The magistrate found Dr. McDonald's testimony not credible as his claims defied logic when the possibilities of swallowing the drugs or the containers rupturing are taken into account. Again the findings of the magistrate are supported by the record and nothing suggests that they are clearly erroneous.

### iv. *Reasonableness*

The low risk involved with the administration of Etomidate and the emergency posed to Husband by the foreign object in his mouth taken together show that the timing and manner of the search were reasonable. The record shows that Husband, upon arrest, did not initially display any abnormal behavior. The police, not being medical experts, likely assumed that whatever was in Husband's mouth was intact. However as soon as Husband started twitching and sweating they called an ambulance. When Husband arrived at the hospital, the doctors assessed the situation and then addressed the medical emergency. The short lapse of time, approximately 12 minutes, between Husband's arrival at the hospital and the administration of Etomidate can be explained by the

---

[10] (...continued)
a possible inability to consent. These issues of consent for medical treatment are more relevant for suits in medical malpractice. The question here is the reasonableness of the method of executing the search warrant. Nothing in the record appears to suggest that Husband consented to the search. We therefore work from the assumption that there was no consent.

fact that Dr. Gravett assessed the situation, attempted to remove the object with the less invasive means of the ceramic spoons, attempted to convince Husband to open his mouth with the threat of the warrant, and finally administered the Etomidate to remove the object. Dr. Gravett testified:

> [W]e waited to obtain appropriate consultation with my peers, waited to consult standard references, make sure Mr. Husband was absolutely safe. We were given the luxury of the ability to delay a brief period of time to establish facts in the case, and then we proceeded ahead as promptly as nurses could retrieve the appropriate medications and we could move ahead. 12 minutes isn't too bad.

The fact that Dr. Gravett requested and asked for and waited for the warrant may argue against the immediacy of the medical emergency, however the district court gave little weight to this fact and we do not find that decision to be clearly erroneous. Indeed, there are many possible explanations for waiting. Dr. Gravett may have believed a warrant would obviate the need for the Etomidate, thinking Husband would comply. Dr. Gravett may have viewed the emergency as presenting a short window of a few minutes in which he could wait to allow the police to obtain the warrant either to cover himself legally or to assist the officers in their efforts to legally obtain the object. In any event, the district court found that Husband faced an extreme medical emergency and Dr. Gravett responded appropriately in the appropriate time frame. This finding was not clearly erroneous.

Considering the low risk of danger associated with Etomidate and the immediate and severe medical emergency caused by Husband's refusal to open his mouth, we conclude that the method by which the search warrant was executed was reasonable. We emphasize the narrowness of this holding. In this case the police officers, via

Dr. Gravett, employed an intrusive method of executing a valid warrant to obtain evidence from Husband. This method was reasonable because that medical procedure presented a low level of risk relative to the alternatives and because the procedure was medically necessary to protect the safety of the patient. We do not address the question of whether the same search would have been reasonable had safer alternatives existed or if Husband had not been faced with a life-threatening emergency. Nor do we address whether these medical circumstances would render the same search reasonable in the absence of a valid warrant. Because we decide that the method of execution of the warrant was reasonable, we need not address the inevitable discovery and good faith exception questions.

### III.  Conclusion

The record shows and the district court found that Husband faced a serious medical emergency and that the method of obtaining the evidence was a relatively low risk procedure that was medically necessary to protect the health and life of Husband. As such, the method of executing the warrant was constitutionally reasonable. Therefore the denial of Husband's motion to suppress is AFFIRMED.

A true Copy:

        Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*