In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-1881

IN RE:

INGERSOLL, INC. et al.,

*Debtors-Appellees,*

APPEAL OF:

BAISE & MILLER, P.C.

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 07 C 50098—**Philip G. Reinhard,** *Judge.*

ARGUED JANUARY 23, 2009—DECIDED APRIL 15, 2009

Before BAUER, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Although many have tried to put a stake through the heart of this fee dispute which refuses to die, all have failed to do the trick. We, as the sixth forum to take a stab at it, are next in line. Now creeping along as a bankruptcy appeal, the case is here after stops at the District of Columbia Bar Attorney/Client Arbitration Board, the Superior Court of the District of Columbia, the Superior Court of Delaware, the federal bankruptcy court for the Northern District of Illinois, and

finally the federal trial court for that district. Baise & Miller, P.C., the Washington, D.C. law firm in this dispute, is here today appealing an order barring its claim for additional fees under 11 U.S.C. § 105 of the bankruptcy code. In resolving the firm's appeal, we must go back in time to when this saga all began.

The Ingersoll Cutting Tool Company (ICTC), since its inception in the late 1800s, was at the forefront of the metal cutting tool industry. For the vast majority of that time it was a family-owned enterprise, handed down from its founder, Winthrop Ingersoll, to future generations. But that changed in 2001, when Israeli-based Iscar, Ltd. took over in a sale allegedly "masterminded" by the first outside board members in ICTC's history. Prior to the sale, ICTC was owned by the Gaylords, descendants of Mr. Ingersoll and the appellees in this case. They claim they had no desire to sell the company but were duped by the nonfamily CEO and certain directors. According to them, a corporate chauffeur overheard these individuals scheming and laughing in a limousine, reveling in their plan to "take down" ICTC and ship it "overseas where it belonged." Whether this actually occurred is unknown—the Gaylords never managed to get a statement from the chauffeur—but it doesn't make much of a difference. What is important is that when the Gaylords caught wind of this plan, they tried with all their might to stop the sale, retaining Baise & Miller to act on their behalf. And when the law firm failed to make a difference—and sought more money for its services—the Gaylords found themselves trading one battle (over their company) for another (over legal fees).

The Gaylords first contacted Baise & Miller in late November 2000. They explained to partner Marshall Miller that they needed to stop the sale, and Miller agreed to help by filing a motion for a temporary restraining order and a preliminary injunction. Miller allegedly told them not to worry; he was friends with a judge in Delaware who "owed him a favor," so getting the sale enjoined was no big deal. What's more, Miller supposedly said he had contacts in the media who could sling mud at Iscar. He even said he spoke with a three-star lieutenant general (Jim Williams) who was ready to investigate the company on international security grounds. So Miller could handle this thing, no sweat. But he would need help from another lawyer, David Margules of Bouchard, Margules & Friedlander.

Miller and Margules held a phone conference with the Gaylords on December 1. (The Gaylords lived in Illinois; Miller in Washington, D.C.; and Margules in Delaware.) Margules introduced himself, described his background and experience, and told the Gaylords that this sort of thing was his "bread and butter." *Bouchard Margules and Friedlander v. Gaylord*, 2005 WL 2660043, *2 (Sup. Ct. Del. Aug. 31, 2005). But despite all that—and Miller's "friends" in high places—the Gaylords weren't sold.

The deal wasn't sealed until the two attorneys flew to Rockford, Illinois, and met the Gaylords in person. You see, the Gaylords were old-school to a fault: face-to-face meetings were important, but if they went well, they were happy to trust an agreement to a handshake and a promise. In fact, Robert Gaylord, who was more or less

in charge before he passed away during this litigation, conducted "multi-million dollar" deals on this basis. So he thought nothing of reaching an oral agreement to pay Miller a $100,000 retainer, with the understanding that Margules would be paid out of those funds as well.

A few days later, Miller sent the Gaylords a letter "memorializing" their oral agreement. It contained some surprises. After reciting the $100,000 retainer and the fact that Margules would submit his fees to Miller (not the Gaylords), the letter discussed a contingency fee. The Gaylords were shocked. Thinking they had an agreement for a capped fee of $100,000, they refused to sign the contract.

In the meantime, Margules decided he needed a bigger piece of the action. Margules previously reached a deal with Miller where he would receive $25,000 of the retainer based on the expectancy that he would do a quarter of the work. However, as a preliminary injunction hearing drew closer—by this point they had filed suit in Delaware's Chancery Court, a court of equity known mainly for its decisions on corporate matters—Margules saw that he was doing a greater percentage of the work. So Margules asked Miller for more money, and "Miller arbitrarily decided on a new retainer figure, $250,000, because that was the next 'notch' up." *Bouchard Margules and Friedlander*, 2005 WL 2660043 at *2.

Back at the negotiating table with the Gaylords, Miller assured them that $250,000 was the outside figure, and that he would return any unused portion of the fee.

Robert Gaylord agreed to the deal reluctantly; he was willing to pay $250,000 if need be, "but not a penny more." *Id.* at *3. Unfortunately, the agreement was never put in writing, and this caused headaches as the fees escalated well beyond the $250,000 cap.

For all that, the litigation was unsuccessful. The Delaware court denied injunctive relief, and the sale was consummated. Then came the fee dispute. As agreed, the Gaylords deposited $250,000 into Baise & Miller's escrow account. But well after the representation came to a close, the Gaylords hadn't received any invoices from Miller detailing the costs and fees. It turns out there was a logical (if unreasonable) explanation for the delay: the total fees from Miller and Margules outstripped the escrow fund. When the Gaylords finally received the invoices from both attorneys—Margules had been billing Miller all along but received only partial payment—the total came to almost $390,000. Outraged by the request for another $140,000 on top of the "outside figure," the Gaylords wrote Miller and insisted he had it wrong. They explained that the agreement was for no more than $250,000, and if Miller and Margules had trouble apportioning the money, that was their problem. Miller didn't back down. While continuing to demand more money, though, he partially satisfied Margules by paying him $134,205.13—roughly $60,000 short of the total claimed.

When the Gaylords also refused to budge, Baise & Miller filed an action in the D.C. Superior Court. The court stayed the case, however, because the Gaylords agreed to arbitration before the D.C. Attorney/Client

Arbitration Board. The board issued its ruling in late 2004, but unfortunately it failed to decide the critical issue—whether $250,000 represented the Gaylords' maximum liability to both law firms. This is what the board said:

> The total fees and costs to be (or to have been) payable by [the Gaylords] to [Baise & Miller] total $199,514.44. [The Gaylords] paid $250,000 to [Baise & Miller's] trust/escrow account. [Baise & Miller] has paid $134,205.13 (of the $250,000) to Bouchard, Margules & Friedlander. [Baise & Miller] paid to itself the remaining sum of $115,794.87.

> This award does not resolve the issues of whether [Baise & Miller]'s action in paying $134,205.13 to Bouchard, Margules & Friedlander was reasonable or appropriate and expresses no opinion as to how that issue should be resolved. In addition, this award does not resolve, nor express any opinion as to, the reasonableness or recoverability of any fees or costs assessed by the law firm of Bouchard, Margules & Friedlander to [the Gaylords] or to [Baise & Miller].

This decision was not exactly a model of clarity, and it caused problems down the road. The fairest interpretation, however, is that the Gaylords didn't owe Miller any more money (they were seemingly entitled to a refund); to the extent Miller retained less than his due, he couldn't look to the Gaylords for compensation; and Margules would either have to look to Miller for any shortfall or bring his own claim against the Gaylords.

Despite our read, Miller saw things differently. In a motion to confirm the award filed with the D.C. Superior Court, Miller contended that the board's decision meant the Gaylords owed him *more* money. We find that argument baffling, but the Superior Court's response seems even more so. That court said that "the award makes clear that [the Gaylords] owe [Baise & Miller] $199,514.44 and that the [arbitration board] is taking no position on the amounts owed by [the Gaylords] to [Margules]." Fair enough (though we might quibble with the word "owe," since the Gaylords already paid Miller well over that sum). But then we get this: "It is not challenged that [the Gaylords] have paid [Baise & Miller] $115,794.87. Deducting that amount from the award yields a balance of $83,719.57, which is the proper judgment amount here." So the Superior Court ordered the Gaylords to pay an *additional* $83,719.57. We see no way to square that with the board's decision and the fact that the Gaylords had already paid Miller $250,000. Miller may have been entitled to nearly $200,000 of that sum, but it wasn't the Gaylords fault he remitted so much to Margules that just over $115,000 remained. In purporting to enforce the arbitration, the Superior Court effectively determined (without analysis and without meaning to) that Miller was justified in paying Margules some $135,000 and that there was no fee agreement capped at $250,000—issues that the arbitration board expressly declined to resolve. Though they vigorously disagreed with the decision, the Gaylords paid Miller the additional $83,719.57 to put the matter to rest.

As if that were not complication enough, the Delaware Superior Court also had something to say. Margules brought suit against the Gaylords in that forum to recover the extra $60,000 that he had unsuccessfully sought from Miller. The Gaylords maintained the position that they had only contracted with Miller, and for a fixed fee at that. Unlike the D.C. court, however, the Delaware court produced a ruling that was at least facially reasonable. Following a bench trial, the court found that there was no contract between the Gaylords and Margules, but that there *was* "a capped fee agreement between the Gaylords and Baise [&] Miller for $250,000." *Bouchard Margules and Friedlander*, 2005 WL 2660043 at *6. Taking into account the arbitration decision, the court summed up as follows:

> [Margules] was a subcontractor to Baise [&] Miller's contract with the Gaylords. . . . If the DC arbitration board awarded Baise [&] Miller $199,514.44 for its work under the $250,000 retainer, then $50,485.56 remains in the Baise [&] Miller escrow account. The Court finds that any money owed to [Margules] would have to be addressed directly with Baise [&] Miller, the general contractor.

*Id.*

That makes sense. Yet the Delaware Superior Court dismissed the Gaylords' cross-claim against Baise & Miller. Even though the facts showed that the Gaylords had indeed overpaid Baise & Miller, the court held that

aspect of the dispute was *res judicata*.[1] Despite the possible injustice, that seems correct. The doctrine of claim preclusion is premised on the idea that, when a claim has been fully litigated and come to judgment on the merits, finality trumps. *See Nevada v. United States*, 463 U.S. 110, 129-30 (1983); *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471-72 (7th Cir. 2007).

But shelve the inconsistency for now, while we turn to the bankruptcy court's role in this saga. When ICTC was sold to Iscar, the Gaylords found themselves in a tough spot. ICTC was the "crown jewel" of Ingersoll International, Inc. (Ingersoll), the parent company still held by the Gaylords. According to the Gaylords, ICTC accounted for over 90 percent of the profit of Ingersoll. So without ICTC, Ingersoll was a shell of its former self; it couldn't keep up with its creditors, and before long it filed for bankruptcy. And because the Gaylords didn't see "one

---

[1] At least that appears to be the case. The record before us doesn't contain the Delaware Superior Court's order of dismissal, but uncontested pleadings state the cross-claim was indeed dismissed on this basis. And the bankruptcy court echoed that ruling down the road. Although the Gaylords still maintain that they overpaid Baise & Miller, their position on appeal does not rest on that assertion. That is probably for the better, because the scope of this appeal does not permit us to rule on that issue. In any event, we consider the matter settled and, even if we could, do not purport to disturb the earlier decisions of the state courts. Of course, that does not stop us from critiquing the D.C. court's decision which, again, we find rather troubling.

dime" from the sale of ICTC, they had no means to launch a rescue attempt.

Ingersoll and its subsidiaries filed a petition for voluntary bankruptcy under Chapter 11 in April 2003. The Gaylords were not debtors in that case, but they were intimately involved in the proceedings insofar as Ingersoll was the family company. And when the bankruptcy court confirmed a liquidation plan in September 2005, the Gaylords gained a measure of protection. Section 9.1 of the plan provided that the Gaylords

> shall be released from any and all claims and causes of action by all creditors, parties-in-interest, directors, officers, shareholders, agents, affiliates, parent entities, successors, assigns, predecessors, members, partners, managers, employees, insiders, agents and representatives of the Debtors and their estates arising from or relating to the Gaylord Actions, including, without limitation, any claims, causes of action, and counterclaims by any present or former party to any of the Gaylord Actions.

The "Gaylord Actions" were identified as the "non-bankruptcy causes of action captioned *Gaylord, et al. v. Doar, et al.*, C.A. 18542-NC and that portion of the lawsuit captioned *Gaylord, et al. v. Barnes & Thornburg, et al.*, No. 03 L 000023 which is a derivative action on behalf of the Debtors." The first case, *Gaylord, et al. v. Doar, et al.*, C.A. 18542-NC, was the injunctive case in the Delaware court where Miller and Margules served as counsel.

When the plan was confirmed (following an objection period), the debtors served copies of the plan on creditors

and parties-in-interest. Miller received a copy as a party-in-interest.

Earlier, though, in April 2005, Miller filed *another* claim in the D.C. Superior Court. This time, Miller sought consequential damages for the Gaylords' alleged breach of the D.C. arbitration agreement. Because the Gaylords continued to litigate their case against Miller in the Delaware Superior Court after they had agreed to binding and exclusive arbitration in D.C., Miller contended that they were responsible for costs and fees wrongfully incurred in Delaware.

Which, finally, brings us to the issue that prompted this appeal. When Miller failed to dismiss his latest suit following confirmation of the bankruptcy plan, the Gaylords filed a motion in the bankruptcy court seeking injunctive relief and sanctions. Proceeding under 11 U.S.C. § 105—which gives a bankruptcy court the power to issue any "necessary or appropriate" order to carry out the provisions of the bankruptcy code—the Gaylords asked the court to enjoin Miller from maintaining further litigation and to hold him in contempt. They contended that Miller violated the release language contained in section 9.1 of the bankruptcy plan, on the theory that Miller's claim "arose from" or was "related to" one of the Gaylord Actions. Miller disagreed, of course, arguing that his case was only indirectly connected with the Delaware action.

The bankruptcy court ruled on the matter in December 2005, identifying the central issue as whether Miller's claim was governed by the release provision. The

court decided that it was. Noting that the release was intended to be a shield for the Gaylords, the court held that it was sufficient "to encompass the dispute" between the Gaylords and Miller. And the court found it of no moment "whether that dispute is characterized as a fee dispute or a breach of arbitration agreement dispute" because it "is related to the derivative action." But that wasn't the end of the matter, because the court also had to decide whether § 105 authorized the release. The court acknowledged that this was a unique situation in that nondebtors (the Gaylords) were being released from a noncreditor (Miller) of the bankrupt (Ingersoll). Relying on *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), however, the court held the release valid because it was central to the negotiation and ultimate success of the plan. So the bankruptcy court enjoined Miller from pursuing his breach-of-arbitration claim (though it declined to impose sanctions).

Miller appealed to the district court. He seemed to have better luck there—at least at first—as the district court implied that the ruling below could only be sustained if Miller was indeed a creditor of one of the debtors. The district judge asked the bankruptcy court to resolve that issue on remand.

But on remand the bankruptcy court arguably strayed from the district court's order. The bankruptcy judge explained that his prior ruling was based not on Miller's status as a creditor—which in his view Miller was not—but rather on the idea that the release was needed to ensure the success of the bankruptcy plan. Apart from the

creditor issue, the judge felt his original rationale, rooted in § 105, remained adequate to support his decision. So he stuck with it.

The district court had no problem with this. Even if the bankruptcy court went beyond the strict letter of the remand order, the district court was satisfied because the bankruptcy judge provided the "clarification" it was seeking. The court rejected Miller's argument on appeal that the bankruptcy judge had improperly gone beyond the scope of the remand order and violated his due process rights, and so affirmed the ruling without further ado.

The case now finds it way to us, hopefully the last judges to chime in. "We review a district court's decision to affirm the bankruptcy court *de novo*, which allows us to 'assess the bankruptcy court's judgment anew, employing the same standard of review the district court itself used.'" *In re Boone County Utilities, LLC*, 506 F.3d 541, 542 (7th Cir. 2007) (quoting *In re Kmart Corp.*, 381 F.3d 709, 712 (7th Cir. 2004)).

Miller makes two arguments. First, he renews his contention that the release is inapplicable to his claim for breach of the arbitration agreement. Second, he argues that the district court erred as a matter of law in affirming the bankruptcy court when that court went beyond the call of the remand order.

We take these arguments in reverse order. In *United States v. Husband*, 312 F.3d 247, 251 (7th Cir. 2002), we made the unremarkable observation that where the remanding court identifies a "discrete" or "particular"

issue, the lower court is generally limited to that question. But on the other hand, we affirmed our previous statement that the "scope of the remand is determined not by formula, but by inference from the opinion as a whole." *Id.* (quoting *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996)). In other words, "[t]he court may explicitly remand certain issues exclusive of all others; but the same result may also be accomplished implicitly." It follows as a corollary that a court may implicitly issue a *non*exclusive remand order. This might happen when a court seeks clarification and identifies what it believes (but is not certain) is the dispositive issue, which is what happened here. The way we read it, the district court doubted the bankruptcy ruling could be sustained if Miller was not a creditor, so it asked the bankruptcy judge to resolve that issue, which he did. But the district court did not *rule* that the § 105 rationale was flawed, so the bankruptcy judge was within his rights to expand upon that rationale, explaining exactly what he meant. *See United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) (stating that a lower court is generally "free to address issues that the appellate court left undecided"). This view of events seems particularly convincing in light of the district court's reaction. The district court, clearly in the best position to know the scope of its own remand order, said it received the "clarification" it sought. We see no basis to disagree.

On, then, to the meat of the matter: Did the bankruptcy court properly determine that Miller's breach-of-arbitration claim was barred by the release in the bankruptcy plan? We see two sub-issues in this question. First,

as the bankruptcy court itself noted, we have to determine whether the release (valid or not) is by its terms broad enough to cover Miller's claim. We think it clearly is. Under the release, Miller's claim need only "arise from" or "relate to" one of the Gaylord Actions. Because Miller was counsel in one of those cases, and the breach-of-arbitration claim was predicated on a fee dispute arising from that litigation, it is a covered claim.

The next sub-issue—determining whether the release is legally valid—is the trickier of the two. Section 105 of Title 11 authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the bankruptcy code]." 11 U.S.C. § 105(a). This "residual authority" is consistent with a bankruptcy court's "traditionally broad" equitable powers, *In re Airadigm Comm., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008), which also make an appearance within the context of reorganization plans. Similar to § 105, 11 U.S.C. § 1123(b)(6) allows a court to include in a plan "any other appropriate provision not inconsistent with the applicable provisions of [the bankruptcy code]." In *Airadigm*, we held that these two provisions—and the "residual authority" to which they speak—"permit[] the bankruptcy court to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with any provision of the bankruptcy code." *Airadigm*, 519 F.3d at 657. The release in that case—which shielded a nondebtor from the claims of a creditor over the creditor's objection—fit the bill because it was narrow and essential to the reorganization plan as a whole. We

emphasized that the release did not amount to "'blanket immunity' for all times, all transgressions, and all omissions." *Id.* Rather, it applied "only to claims 'arising out of or in connection with' the reorganization itself and d[id] not include 'willful misconduct.'" *Id.* Just as importantly, we noted that the third party would not have participated without the release, and its participation was "essential" to the plan's success. *Id.*

Our decision in *Airadigm* echoed the Second Circuit's earlier ruling in *Metromedia*, the case relied on by the bankruptcy judge. Although the Second Circuit rejected the release in *Metromedia*, it held that bankruptcy courts have the authority—in limited cases—to bar nonconsenting creditors from suing third parties. *Metromedia*, 416 F.3d at 141. The court identified similar considerations and, like us, preached caution. *See id.* at 143 ("A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan . . . ."). A nondebtor release should only be approved in "rare cases," the court explained, because it is "a device that lends itself to abuse." *Id.* at 141, 142. This is especially true when the release provides blanket immunity: "In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code." *Id.* at 142.

In this case, however, the release does not provide blanket immunity. As in *Airadigm*—and in contrast to *Metromedia*—it is narrowly tailored and critical to the

plan as a whole. The release only covers claims arising from or relating to two cases (the Gaylord Actions), so it is far from a full-fledged "bankruptcy discharge arranged without a filing and without the safeguards of the Code." The Gaylords can still be sued by any number of creditors with independent claims. Just as importantly, the bankruptcy court found that the release was an "essential component" of the plan, the fruit of "long-term negotiations" and achieved by the exchange of "good and valuable consideration" by the Gaylords that "will enable unsecured creditors to realize distribution in this case." After reviewing the record, we agree.

On the other hand, we acknowledge that this is not a straightforward application of *Airadigm* and *Metromedia*. Those cases were different in that the plans shielded nondebtors from suit by creditors of the bankrupt. As the bankruptcy court stated, the case before us is one step removed—the Gaylords are nondebtors, but Miller is not a creditor of Ingersoll. But we don't think that is dispositive when the party whose claim was extinguished received fair notice and an opportunity to object. And there is nothing in the bankruptcy code that tells us otherwise.

Yet, it is important to note in all this what we are *not* saying. We are not saying that a bankruptcy plan purporting to release a claim like Miller's is always—or even normally—valid. In the unique circumstances of this case, however, we believe it is. We go no further than to apply the rule we adopted in *Airadigm* to the facts at

hand. In most instances, releases like the one here will not pass muster under that rule. Bankruptcy litigants should keep that in mind when they sit down at the negotiating table.

But perhaps there is a broader lesson in this case, a lesson for litigants of all types: Good advocacy does not exist in a vacuum; it must be balanced with a willingness to compromise, to behave reasonably, and, sometimes, to leave well enough alone. If these counterweights are neglected, things can get ugly in a hurry. This case illustrates the point. What started as a simple fee dispute ended as a multi-year, multi-court monster that, as far as we can tell, benefitted no one. Baise & Miller had a number of opportunities to avoid this result.

The judgment of the district court is AFFIRMED.[2]

---

[2] The motion to intervene filed by trustee Christopher G. Bryan is denied as moot. Bryan only sought to intervene to file a motion to dismiss the appeal because he feared reversal would disrupt the bankruptcy plan. Since we maintain the status quo, Bryan effectively gets what he wants.