# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2509

IN RE:

GREDE FOUNDRIES, INC.

*Debtor.*

REEDSBURG UTILITY COMMISSION,

*Plaintiff-Appellant,*

*v.*

GREDE FOUNDRIES, INC.,

*Debtor-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 10-CV-84—**Barbara B. Crabb**, *Judge.*

ARGUED JANUARY 18, 2011—DECIDED JULY 13, 2011

Before TINDER and HAMILTON, *Circuit Judges*, and
MURPHY, *District Judge.**

---

* The Honorable G. Patrick Murphy of the Southern District
of Illinois, sitting by designation.

TINDER, *Circuit Judge.* When debtor and appellee Grede Foundries, Inc. entered bankruptcy, the Wisconsin smelting plant owed more than $1.3 million in delinquent utility charges to the local municipal utility, appellant Reedsburg Utility Commission. Months after Grede filed for bankruptcy, and despite the automatic stay that accompanied Grede's filing, Reedsburg implemented the process pursuant to state law by which it could collect on Grede's arrearage. Grede sought to enforce the stay. The bankruptcy court and the district court found that none of the exceptions to the automatic stay applied to Reedsburg's efforts to collect on Grede's debt, which is substantial considering that Grede's billings constituted more than one-third of Reedsburg's operating revenue. We are sympathetic to Reedsburg's plight but the exceptions to the automatic stay do not apply to Reedsburg's efforts to collect on Grede's debt. We affirm.

## I. Background

Grede owned properties in Reedsburg, Wisconsin, that received utility services from the Reedsburg Utility Commission, a municipal utility. The utility services— primarily electricity—were critical to Grede's operations. The foundry conducted the electricity through rods to heat vats of molten steel to press into parts for the automotive industry. Heating the rods to the appropriate degree to melt steel produced a hefty electric bill; Grede's average monthly utility bill was around $600,000 to $700,000. Reedsburg's billings with Grede were also significant, constituting about 35% of its operating

revenue in 2008. Reedsburg provides electric, water, telephone, internet, and cable TV service to 4,170 residents and 681 businesses in the Reedsburg area in Sauk County, Wisconsin.

Perhaps triggered by the major downturn in the American automotive industry, Grede voluntarily filed for Chapter 11 bankruptcy on June 30, 2009, with assets between $100 million and $500 million. The filing initiated the automatic stay pursuant to 11 U.S.C. § 362(a)(4) & (6), halting "any act to create, perfect, or enforce any lien against property of the estate" or "any act to collect, assess, or recover a claim." Yet Congress also created several exceptions to the automatic stay, three of which are at issue in this appeal: perfecting prepetition interests in property, *id.* § 362(b)(3), determining the existence of and providing notice of a tax matter, *id.* § 362(b)(9), and creating or perfecting a lien for a special tax or special assessment on real property, *id.* § 362(b)(18). At the time of filing, Grede owed Reedsburg $1,312,314.09 in prepetition unpaid utility charges—or a few months' worth of utility services. Grede continued operating as a debtor in possession pursuant to 11 U.S.C. §§ 1107(a), 1108.

The Wisconsin law governing how municipal utilities collect on an arrearage is fairly straightforward for our purposes. Reedsburg must give delinquent property owners a written notice on October 15 of their pre-October 1 arrearage for the year pursuant to Wis. Stat. § 66.0809(3). The notice must state:

> that unless the amount is paid by November 1 a penalty of 10 percent of the amount of arrears will

be added; and that unless the arrears, with any added penalty, are paid by November 15, the arrears and penalty *will be levied as a tax* against the lot or parcel of real estate to which utility service was furnished and for which payment is delinquent.

*Id.* (emphasis supplied). On November 16 of each year, Reedsburg must submit to local government officials a certified list of the properties in arrears and the amounts due so that

[e]ach delinquent amount, including the penalty, *becomes a lien* upon the lot or parcel of real estate to which the utility service was furnished and payment for which is delinquent, and the clerk shall insert the delinquent amount and penalty *as a tax* against the lot or parcel of real estate. All proceedings in relation to the collection of general property taxes and to the return and sale of property for delinquent taxes apply to the tax if it is not paid within the time required by law for payment of taxes upon real estate.

*Id.* (emphases supplied). Thus, pursuant to Wis. Stat. § 66.0809(3), on October 15, 2009, Reedsburg's general manager David Mikonowicz sent Grede nineteen separate notices regarding the unpaid utility charges. The notices stated:

Our records indicate a current balance in the amount of $[amount] for the account of GREDE FOUNDRY at [location].

>As provided for in sections 66.0809 and 66.0627 of the Wisconsin Statutes and Reedsburg City Ordinance No. 1083 Section 3.08, unpaid electric, water and sewer bills become a lien against the property if they remain uncollected after October 30, 2009.

>* * *

>We are aware that Grede Foundry is a debtor in a currently pending Chapter 11 bankruptcy proceeding. . . . This letter constitutes notice of the Reedsburg Utility Commission's right under municipal ordinance and state law to place amounts due on this account on the property tax roll. This notice does not constitute the filing of a lien. This notice is provided pursuant to and in compliance with 11 U.S.C. § 362(b)(3) and 546(b)(1)(A).

Grede's account balances with Reedsburg ranged from $20.26 to $1,271,649.33. On November 3, Reedsburg reported all delinquent charges, including Grede's, to the City. On November 12, the City reported all delinquent utility charges to the Sauk County Treasurer, including Grede's arrearage. The City typically reimbursed Reedsburg for all arrearages from its general fund, but the size of Grede's delinquency proved too much for the City.

But for Grede's bankruptcy filing, Grede's arrearage would have been included in the following process pursuant to Wisconsin law and Reedsburg's ordinances and practices. The City calculated and reported its mill rate to the County Treasurer in late November or early Decem-

ber. Then the County printed and mailed property tax bills during the first two weeks of December. Unpaid utility charges, (such as Grede's but for the bankruptcy filing), appeared on the bills as a "special charge." The City accepted payment for the entire property tax bill including the special charge up to January 31. Pursuant to Wis. Stat. § 74.11(12), money the City received would be applied first to personal property taxes and next to late utility charges. After January 31, the County paid the City for all unpaid property taxes and special charges and assumed responsibility for collecting the unpaid amounts. If an arrearage persisted after the due date, the County sent the property owner a notice, and if the owner still did not pay, the County placed a lien on the property for the amount of the arrearage, including unpaid utility charges.

Yet the process for collecting on Grede's arrearage halted when Grede filed a motion on November 5 to enforce the stay and hold Reedsburg in contempt for violating the stay. The bankruptcy court held on November 12 that Reedsburg was not in contempt and deferred deciding whether Reedsburg violated the stay. But the court ordered Reedsburg, the City, and the County to refrain from taking actions "to create, file, perfect, or enforce any lien against Grede's real property or to place any unpaid utility charges for utility services on the property tax roll. . . ." Thus, Grede's unpaid utility charges were left off Grede's 2009 property tax bill.

The bankruptcy court found on December 21 that Reedsburg violated the automatic stay by sending delin-

quency notices to Grede and reporting the delinquencies to the City. The court voided Reedsburg's "actions to perfect a lien against Grede's properties" and found that Reedsburg's actions constituted efforts to create or perfect a lien or collect a debt within the meaning of 11 U.S.C. § 362(a) and that none of the § 362(b) exceptions applied. *In re Grede Foundries, Inc.*, No. 09-14337, 2009 WL 4927491, at *6 (Bankr. W.D. Wis. Dec. 21, 2009). The district court affirmed, *Reedsburg Util. Comm'n v. Grede Foundries, Inc.*, No. 10-cv-84-bbc, 2010 WL 2159358 (W.D. Wis. May 24, 2010), and Reedsburg filed a timely appeal.

## II. Analysis

The parties do not dispute this case's facts. Their disagreement involves an analysis of state and federal statutes. Thus, we apply de novo review, "which allows us to 'assess the bankruptcy court's judgment anew.'" *In re Ingersoll, Inc.*, 562 F.3d 856, 863 (7th Cir. 2009) (quoting *In re Boone Cnty. Utils., LLC*, 506 F.3d 541, 542 (7th Cir. 2007)).

The automatic stay generally prohibits, among other actions, "any act to create, perfect, or enforce any lien against property of the estate" or "any act to collect, assess, or recover a claim." 11 U.S.C. § 362(a)(4) & (6). The stay functions as "one of the fundamental protections afforded to debtors by the bankruptcy laws," *In re 229 Main St. Ltd. P'ship*, 262 F.3d 1, 3 (1st Cir. 2001), as it preserves "what remains of the debtor's insolvent

estate and [provides] a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, thereby preventing a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts," *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982) (quotations and citations omitted). Reedsburg abandoned arguing at the district court that it did not act to perfect or create a lien but maintained that a § 362(b) exception applied to its actions. Courts interpret these exceptions narrowly to give the automatic stay its intended broad application. *See In re Stringer*, 847 F.2d 549, 552 (9th Cir. 1988) ("Congress clearly intended the automatic stay to be quite broad. Exemptions to the stay, on the other hand, should be read narrowly to secure the broad grant of relief to the debtor." (footnotes omitted)). Reedsburg argues that at least one of three exceptions applied to its efforts to collect on Grede's unpaid utility charges: perfecting a prepetition interest in property, *id.* § 362(b)(3), determining the existence of a tax liability and providing notice of the tax liability, *id.* § 362(b)(9), and creating or perfecting a lien for a special tax or a special assessment on real property, *id.* § 362(b)(18). We will examine in turn whether any one of those exceptions applied to Reedsburg's actions.

## A. Section 362(b)(3) exception

Reedsburg argues that the exception for perfection of a prepetition interest pursuant to 11 U.S.C. § 362(b)(3)

applied to its actions. Section § 362(b)(3) provides that
the automatic stay does not halt:

> any act to perfect, or to maintain or continue the
> perfection of, *an interest in property* to the extent
> that the trustee's rights and powers are subject to
> such perfection under section 546(b) of [the
> Code] . . . .

*Id.* (emphasis supplied). Section 546(b)(1)(A) in turn
subjects the trustee's avoidance powers to any generally
applicable law that (emphasis supplied):

> (A) permits perfection of *an interest in property* to
> be effective against an entity that acquires rights
> in such property before the date of perfection . . . .

The narrow purpose of this "exception is to 'protect,
in spite of the surprise intervention of [the] bankruptcy
petition, those whom State law protects' by allowing
[creditors] to perfect an interest they obtained be-
fore the bankruptcy proceedings began." *In re Parr Mead-
ows Racing Ass'n, Inc.*, 880 F.2d 1540, 1546 (2d Cir. 1989)
(quoting legislative reports). Stated otherwise, "'if an
interest holder against whom the trustee would have rights
still has, under applicable nonbankruptcy law, and as of
the date of the petition, the opportunity to perfect his
lien against an intervening interest holder, then he
may perfect his interest against the trustee.'" *Makoroff v.
City of Lockport, N.Y.*, 916 F.2d 890, 891-92 (3d Cir.

1990) (quoting legislative reports).[1] As the Third Circuit explained in *Makoroff*, the paradigm § 546(b) case arises under the Uniform Commercial Code, where a perfected security interest relates back to either the filing of a financing statement or the date that the security interest attaches. *See id.* at 892 (citing legislative history). If the creditor has a prepetition unperfected interest in the debtor's property, this exception allows the creditor to take the steps necessary to perfect that interest because "[s]uch a *perfection* of a lien is not considered the *creation* of a lien." *Id.* at 892 n.1. Without § 546(b), creditors could not perfect their interests without violating the automatic stay "even if all that remained was a ministerial act" to achieve perfection. *Id.* at 892. The § 546(b) exception permits "a creditor to snatch victory from the jaws of defeat . . . when the debtor files bankruptcy before a security interest" is perfected. Ginsberg & Martin on Bankr. § 3.02[F].

The baseline issue is whether Reedsburg acquired prepetition "an interest in property" within the meaning of § 362(b)(3) and § 546(b)(1)(A), *see 229 Main St.*, 262 F.3d at 5; *Makoroff*, 916 F.2d at 893; *Parr Meadows*, 880 F.2d at 1546; *see also In re AR Accessories Grp., Inc.*, 345

---

[1] Congress rendered the specific holdings in *Makoroff* and *Parr Meadows* moot by enacting the 11 U.S.C. § 362(b)(18) exception, noted *infra* n.4, *see* H.R. Rep. No. 103-835, at 58-590 n.20 (1994), *reprinted in* 140 Cong. Rec. 27,698 (1994), 1994 U.S.C.C.A.N. 3340, 3367-68 n.20, but their reasoning remains instructive. *See 229 Main St.*, 262 F.3d at 6 n.4.

F.3d 454, 458 (7th Cir. 2003) (addressing the "interest in property" provision as an alternative grounds for affirmance). If Reedsburg acquired an interest in Grede's property, Reedsburg would also have to show that Wis. Stat. § 66.0809(3) allows that interest "to be effective against an entity that acquires rights in such property before the date of perfection." *See* 11 U.S.C. § 546(b)(1)(A); *229 Main St.*, 262 F.3d at 10.[2] But we do not need to address whether Reedsburg's interest would be effective against an entity that acquired rights in the property before the date of perfection because our analysis begins and ends with whether Wis. Stat. § 66.0809(3) granted Reedsburg "an interest in property" for purposes of § 362(b)(3) and § 546(b)(1)(A). Reedsburg argues that it acquired an interest in Grede's property by sending Grede utility bills or alternatively when it provided Grede with utility services[3] because these actions set in motion a process by which Reedsburg could have

[2] Creditors must also act pursuant to a law of general applicability, § 546(b)(1), but the parties do not dispute that Wis. Stat. § 66.0809(3) applies generally. *See 229 Main St.*, 262 F.3d at 10 (noting that for a law to be "generally applicable," it must apply to cases regardless of a bankruptcy (citing *Makoroff*, 916 F.2d at 892)).

[3] At oral argument, Reedsburg's counsel suggested that the interest in Grede's property arose when a bill came due—twenty or thirty days after mailing. This argument is not developed in Reedsburg's briefs, but we note that our holding applies to all three proposed dates.

obtained a perfected tax lien. We disagree with Reedsburg's broad reading of the exception. Although Congress did not limit the exception to formal liens, *see 229 Main St.*, 262 F.3d at 5-7, Reedsburg only had the possibility of an interest in Grede's property when Grede filed its bankruptcy petition on June 30—not an interest in Grede's property.

We have no doubt that Reedsburg's action of delivering services to Grede or mailing Grede utility bills created a debt or an account. But unless and until Reedsburg performed the requirements of Wis. Stat. § 66.0809(3), Reedsburg could not claim any interest in Grede's property. Reedsburg's interest at the time of service and billing amounted to accounts for services rendered or energy provided, *see, e.g.,* U.C.C. § 9-102(2)(ii) & (v). Holding that Reedsburg's prepetition actions of delivering services or mailing utility bills gave Reedsburg an interest in Grede's property would functionally give Wisconsin municipal utilities an ever-present interest in their customers' property to the extent of the monthly utility bill. We do not believe Congress intended the § 362(b)(3) exception to stretch that far, particularly when the state statutory scheme limits the municipal utility's ability to acquire an interest in a debtor's property to particular dates. *Cf. In re Glasply Marine Indus., Inc.*, 971 F.2d 391, 395 (9th Cir. 1992) (rejecting the proposition that Congress intended to create an "ever-present interest" for the § 546(b) exception); *Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 86 (3d Cir. 1989) (same); *Parr Meadows*, 880 F.2d at 1547 (same). *But cf. Md. Nat'l Bank v. Mayor of Baltimore*, 723 F.2d 1138, 1141-44 (4th

Cir. 1983) (holding that pursuant to Maryland law, the government maintains an "ever-present" interest in property owners' land for tax purposes). The statutory mechanism giving Reedsburg an interest in Grede's property does not even apply if Grede pays its past due balances by October 1; Reedsburg's mailing of the October 15 notices served as the *first* of a series of actions that would give Reedsburg an interest in Grede's property. *See* Wis. Stat. § 66.0809(3). We would have a closer case if Grede's bankruptcy filing occurred after October 15 or even October 1, but we will not speculate when a municipal utility acquires an interest in its customers' property pursuant to Wis. Stat. § 66.0809(3) because such hypothesizing is unnecessary for our holding that Reedsburg did not obtain an interest in Grede's property at the time of service or billing.

Reedsburg argues that the Second Circuit's analysis in *Parr Meadows* suggests that its mailing of utility bills gave Reedsburg a prepetition interest in Grede's property. In *Parr Meadows*, the court found that a county obtains a § 546(b) interest in property on a statutorily established "tax status date" when all properties are assessed. 880 F.2d at 1546-47. Upon the tax status date, the county received "a real and identifiable interest in the property which cannot be erased or altered by subsequent events." *Id.* at 1548. Although adjustments could be made, clerical mistakes could be corrected, and the actual property taxes were not levied until at least six months later, the tax status date gave the county an interest in a property because the county (1) determined the property was taxable and (2) fixed the value of the property. *See id.* at 1547. The actions

subsequent to the tax status date constituted "merely further steps towards the completion of the taxation process and the perfection of the county's interest in the property." *Id.*

Here, Reedsburg's actions of sending Grede utility bills or providing utility services did not fix "a real and identifiable interest" in Grede's property which could not "be erased or altered by subsequent events." *Id.* at 1548. Grede's payment of its utility bills pre-October 1 would have wiped out Reedsburg's ability to attach any interest in Grede's property. In *Parr Meadows*, the persistent nature of property taxes kept the property owners from ducking the state's ability to acquire an interest in their property after the assessment on the tax status date. If the provision of utility services or the mailing of a bill triggered the creation of "an interest in property," any number of debts that could potentially attach to the debtor's property would be drawn into the exception's orbit even though at the time of the bank-ruptcy filing the debts were mere accounts due for services rendered.

*AR Accessories* illustrates how a state law gives an entity an interest in property for the § 546(b) exception, 345 F.3d at 458, and contrary to Reedsburg's arguments, why Wis. Stat. § 66.0809(3) does not perform the same function. The *AR Accessories* statute provided that Wisconsin's Department of Workforce Development:

> shall have a lien upon all property of the employer, real or personal, located in this state for the full amount of any wage claim or wage deficiency. A

lien under this subsection takes effect when the Department files a verified petition claiming the lien with the clerk of the circuit court of the county in which the services or some part of the services were performed within 2 years after the date that the wages were due. . . .

*Id.* at 456-57 (brackets and alterations omitted) (quoting Wis. Stat. § 109.09(2) in its form at the time of the bankruptcy court's decision). Despite the Wisconsin legislature's deletion of language in this statute that explicitly stated that the lien interest existed as of the date of the last unpaid services, the bankruptcy court found that the legislative history and a Wisconsin state court case justified finding that the department's wage lien arose when the last unpaid services were performed by the debtor's employees. *See id.* at 458-59 (citing *Pfister v. Milwaukee Econ. Dev. Corp.*, 576 N.W.2d 554, 558 (Wis. Ct. App. 1998)). We agreed and held that the effective date of the lien in the debtor's property was when the debtor's employees performed the last unpaid services. The filing of the petition with a county clerk merely provided notice of the claim and did not create "any new interest within the meaning" of § 546(b). *Id.* at 459 n.4.

We cannot find and Reedsburg does not point to any Wisconsin authority or legislative history suggesting that Wis. Stat. § 66.0809(3), like the wage lien statute, gives a municipal utility an interest in a delinquents' property by merely providing utility services or mailing utility bills. Although the statute in *AR Accessories* did not expressly state that the wage lien came into

existence when the employee performed services, it did state that the department "shall have a lien." By contrast, Wis. Stat. § 66.0809(3) states that the "delinquent amount . . . becomes a lien" not when services are rendered or bills delivered, but *after* (1) notice is provided on October 15; (2) a list of properties in arrears is furnished to municipal officials; (3) the arrearage remains unpaid by November 15; and (4) the municipal officials file a list with the county clerk on November 16. Only then, and assuming Grede did not meanwhile pay its utility bill, could the "delinquent amount . . . become[] a lien" on Grede's property. Thus, because Reedsburg did not have a prepetition interest in Grede's property, the § 362(b)(3) exception did not apply to Reedsburg's actions.

## B.  Section 362(b)(9) exception

Reedsburg next argues that one of the exceptions in 11 U.S.C. § 362(b)(9) applied to its actions. Section 362(b)(9) provides that a filing does not stay:

> (A) an audit by a governmental unit to determine tax liability;

> (B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;

> * * *

> (D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment . . . .

This exception allows government entities to determine the amount of tax due and send the bill to the taxpayer/debtor without violating the automatic stay. *See In re Innovation Instruments, Inc.*, 228 B.R. 313, 314-15 (Bankr. N.D. Fla. 1998) (citing lawmaker's statement). The exception's legislative history suggests Congress wanted to expand the IRS's ability to assess tax liability but not actually collect on the taxes. *See id.*

Although there is room for debate in some cases what constitutes a tax, *compare Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, No. 09-3975, 2011 WL 2652201, at *1-11 (7th Cir. July 8, 2011) (en banc), *with id*. at *11-18 (Sykes, J., dissenting), Reedsburg's utility charges in no sense constitute a tax despite the fact that they potentially end up on a property tax bill among genuine taxes, *see* Wis. Stat. § 74.11(12) (distinguishing "delinquent utility charges" from other taxes). We note that Wis. Stat. § 66.0809(3) states that arrears for utility services "will be levied as a tax." But the phrase "as a tax" simply gives a municipality the ability to collect the unpaid charge *as if* the charges were a tax, or "in the same way or manner" of a tax. *See, e.g.*, *Webster's Third New Int'l Dictionary* 125 (1986) (defining "as").

Even if the phrase "as a tax" somehow transformed the utility charges into a tax, state law terms are not dispositive in bankruptcy law. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220-21 (1996) (noting that the Court places "no weight on the 'tax' label in the" state law). Instead, we look to the

state statute merely to determine whether "its incidents are such as to constitute a tax within the meaning" of the Code provision. *Id.* (quoting *City of New York v. Feiring*, 313 U.S. 283, 285 (1941)). A tax is generally defined as a source of revenue that provides general benefits to the public. *See, e.g.*, *Hager v. City of W. Peoria*, 84 F.3d 865, 870 (7th Cir. 1996); *Diginet, Inc. v. W. Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992) (holding that the test for identifying a tax, regardless of "its nominal designation," is whether "it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits"); *Black's Law Dictionary* 1594 (9th ed. 2009) (defining "tax" as a "charge, usu. monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue"); *Webster's Third New Int'l Dictionary* 2345 (1986) (defining "tax" usually as a "pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes"). The utility charges in this case do nothing more than recover Reedsburg's costs of delivering utility services. Because the utility charges are not taxes, the § 362(b)(9) exception does not apply to Reedsburg's actions.

## C. Section 362(b)(18) exception

Reedsburg's final argument—that the 11 U.S.C. § 362(b)(18) exception applied to its actions—also fails. Section 362(b)(18) provides that the automatic stay does not apply to:

the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition[.]

The exception's intent was to reverse decisions that had held that the automatic stay blocked local governments from attaching statutory liens for property taxes that accrued subsequent to a bankruptcy filing. *See* H.R. Rep. No. 103-835, at 58-59 (1994), *reprinted in* 140 Cong. Rec. 27,698 (1994), 1994 U.S.C.C.A.N. 3340, 3367-68. Because local governments rely on such taxes as "one of their principal sources of revenue" usually secured via statutory liens, certain court decisions[4] created "a windfall for secured lenders, who would otherwise be subordinated to such tax liens," and significantly impaired revenue collection. *Id.* at 58. Congress intended this section to overrule such cases and allow local municipalities to use their property tax liens to secure "payment of property taxes." *Id.* at 59.

Reedsburg argues that the unpaid utility charges are either a special tax or special assessment. We disagree. As we held above, the unpaid utility charges are not taxes. The charges do not raise revenue; they pay for utility services Reedsburg provided Grede. And there is

---

[4] Namely, *Parr Meadows*, 880 F.2d 1540, and *Makoroff*, 916 F.2d 890; *see supra* n.1.

nothing "special" about them. They are regular, run-of-the-mill delinquent charges (although quite large) for routine everyday utility services.

Our exclusion of municipal utility charges from the terms "special tax" and "special assessment" is supported by a variety of authorities. In *Illinois Central R.R. v. City of Decatur*, 147 U.S. 190, 197-98 (1893), the Supreme Court defined the terms "special assessments" and "special taxes" as charges "imposed upon property within a limited area for the payment for a local improvement" that is "supposed to enhance the value of all property within that area." More recently, the Court of Federal Claims held, relying on *Illinois Central Railroad Co.*, 147 U.S. at 197-98, that a "special assessment" is defined as a one-time charge levied exclusively against properties "specially" benefiting from a particular improvement. *Wright Runstad Props. Ltd. P'ship v. United States*, 40 Fed. Cl. 820, 826 (1998). Similarly, Chapter 9 of the Bankruptcy Code defines "special tax payer" as the owner of "property against which a special assessment or special tax has been levied the proceeds of which are the sole source of payment of an obligation issued by the debtor to defray the cost of an improvement relating to such real property." 11 U.S.C. § 902(3); *see also* Carl M. Jenks, *The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005: Summary of Tax Provisions*, 79 Am. Bankr. L.J. 893, 896 n.19 (2005) (noting that the terms "special tax" and "special assessment" in 11 U.S.C. § 362(b)(18) "refer to charges that relate to specific projects that a jurisdiction undertakes to benefit a particular area and that are funded in whole or in part

from taxes imposed on properties in the area receiving the benefit").

The utility charges do not defray the cost of improving Grede's property or benefit Grede's property in any particular way; Reedsburg's provision of electricity (along with providing water and sewer services) allowed Grede to heat vats of molten steel. Stretching the defraying of real property improvement costs to include the provision of utility services is not a plausible interpretation of this exception. We appreciate that Congress wanted to reverse decisions holding that the automatic stay prevented municipalities from attaching liens for property taxes accruing after a bankruptcy filing, but if Congress wanted to sweep prepetition utility charges into this exception, it would have done so using more explicit language. Because Reedsburg's utility charges do not qualify as special taxes or special assessments, the § 362(b)(18) exception does not apply to Reedsburg's actions.

### III. Conclusion

Reedsburg was in a tough spot when its largest customer filed for bankruptcy protection with more than $1.3 million in unpaid utility charges. But we cannot ignore the automatic stay's broad purpose or the narrow purposes to which the exceptions apply.

AFFIRMED.